THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. MARCOS VILLAGOMEZ, Defendant-Appellant.

First District (5th Division)    No. 1—97—3936

Opinion filed May 26, 2000.

Rita A. Fry, Public Defender, of Chicago (Andrea Monsees, Assistant Public Defender, of counsel), for appellant.

Richard A. Devine, State's Attorney, of Chicago (Renee Goldfarb, James E. Fitzgerald, and Jean T. McGuire, Assistant State's Attorneys, of counsel), for the People.

JUSTICE QUINN delivered the opinion of the court:

Following a jury trial, defendant Marcos Villagomez was convicted of first degree murder and sentenced to 30 years' imprisonment. On appeal, defendant contends that: (1) the trial court erred in denying his motion for a continuance to secure the presence of witnesses; (2) the trial court erred in refusing to allow defense counsel to ask prospective jurors during *voir dire* whether they would follow the law of self-defense; (3) the trial court erred in denying defendant's motion to suppress his statements because he only spoke Spanish and did not knowingly and voluntarily waive his *Miranda* rights and his confession should have been excluded as hearsay; (4) the State made

improper comments during closing argument that shifted the burden of proof to defendant; (5) the trial court improperly allowed the jury to view gruesome photographs during their deliberations; (6) defendant should receive a new sentencing hearing or, in the alternative, a reduction in his sentence because the presentence investigation report prepared prior to sentencing was inadequate; and (7) the sentencing court erred in denying defendant day-for-day good time credit pursuant to section 3—6—3 of the Unified Code of Corrections (730 ILCS 5/3—6—3 (West 1996)). Defendant also filed a supplemental brief in which he contended that he was not advised of his right to assistance of his country's consul in violation of article 36(1) of the Vienna Convention on Consular Relations. Vienna Convention on Consular Relations, April 24, 1963, art. 36, 21 U.S.T. 77, 596 U.N.T.S. 261 (hereinafter Vienna Convention or Convention). The issues relating to the admission of defendant's statement and what implications arise from a violation of the Vienna Convention will be considered in this opinion; all other issues will be determined in a separate Supreme Court Rule 23 order disseminated contemporaneously. For the reasons that follow, we affirm as modified.

Defendant's conviction arose from the fatal stabbing of Socorro Villa on May 19, 1996. Prior to trial, defendant filed a motion to suppress his statements pursuant to section 114—11 of the Code of Criminal Procedure of 1963. 725 ILCS 5/114—11 (West 1996).

At the hearing on the motion to suppress, Officer Freddie DeLeon testified that on May 22, 1996, at the corner of 1800 South Throop Street in Chicago, he arrested defendant and advised him of his *Miranda* rights in Spanish. DeLeon testified that defendant indicated that he understood those rights. After DeLeon brought defendant to the police station for questioning, defendant admitted to DeLeon that he stabbed the victim. DeLeon then placed defendant in an interview room. DeLeon testified that he did not hear any screaming or loud noise coming from the interview room while defendant was there.

Detective Fernando Montilla testified that he and Detective Anthony Carothers questioned defendant in the interview room at approximately 4:45 p.m. on May 22, 1996. Montilla testified that he informed defendant that he spoke Spanish and proceeded to speak to him in that language. Montilla is of Puerto Rican descent. Montilla advised defendant of his *Miranda* rights in Spanish and defendant indicated that he understood. Montilla questioned defendant about the murder for approximately 20 minutes, and after this first round of questioning, Montilla made sure that defendant was fed and that he had water. Defendant was also given cigarettes and the option to sleep on a long bench or in chairs that Montilla brought into the interview

room. At approximately 10 p.m., an assistant State's Attorney arrived at the police station. The assistant State's Attorney then interviewed defendant with Montilla acting as interpreter. Montilla testified that he informed defendant that the assistant State's Attorney was employed by the State's Attorney office and that she was not his lawyer. Montilla testified that he never told defendant that he had to answer the assistant State's Attorney's questions. Defendant indicated that he understood. Defendant then agreed to speak with the assistant State's Attorney with Montilla acting as an interpreter.

Montilla testified that he accurately translated the conversation, including additional *Miranda* warnings. When the assistant State's Attorney asked defendant how he was treated by the police, defendant stated that he had been treated fairly. Defendant then agreed to put the statement in writing. As the assistant State's Attorney wrote defendant's statement, Montilla translated the statement from Spanish to English. After the statement was written, Montilla translated each sentence from English to Spanish and asked defendant if each sentence was correct. Defendant said yes and then Montilla told the assistant State's Attorney that it was correct. Once the corrections were made, defendant placed his initials at the bottom of each page of the statement.

On cross-examination, Montilla testified that defendant's version of the events differed from the version Montilla received from the two witnesses, Rafael Villa and Beto Renteria, and he confronted defendant with this fact. Montilla also testified that he specifically explained to defendant how his statement could be used against him. Montilla testified that, because defendant is from Mexico, he wanted to ensure that defendant understood his rights.

Defendant testified that he had lived in the United States since 1977 and that when he gave Montilla his version of the events, Montilla accused him of lying. Defendant said that Montilla's behavior toward him was proper during the initial interrogation, but during the second interrogation, Montilla yelled at him. The third time they spoke, Montilla said that if defendant did not tell him the truth, he was going to "sit me in the electric chair or put me in jail for life." Defendant testified that he was frightened and panicked.

Defendant further testified that Montilla told him the following regarding the assistant State's Attorney: that she was his attorney; that she was from the State; and that defendant had to answer all of her questions. Defendant also thought that she was the attorney that had been assigned to him. Defendant testified that he also thought she was representing him because Montilla said that if he could not afford an attorney the State would provide him with one. Defendant also

testified that he did not understand the handwritten statement and that he signed the written statement before it was even read to him.

On cross-examination, defendant testified that Montilla did not translate the assistant State's Attorney's reading of the constitutional rights at that time. After the assistant State's Attorney began to speak, Montilla told defendant to tell her how the fight between defendant and the victim began. Defendant testified that the assistant State's Attorney just began to write and only asked defendant a question occasionally. Defendant denied that he told Montilla that he was giving the statement freely and voluntarily. Defendant also denied that he spoke to the arresting officers.

In rebuttal, the assistant State's Attorney who interviewed defendant testified that Montilla acted as an interpreter during her interview with defendant. She testified that she told defendant in English that she was an assistant State's Attorney, a prosecutor, and not his lawyer. Montilla then turned to defendant and spoke to him in Spanish while defendant nodded. The assistant State's Attorney testified that she read defendant's *Miranda* rights to him and, after each right, Montilla spoke to defendant in Spanish. After each *Miranda* right, defendant indicated that he understood either by nodding or saying, "Si." With Montilla translating in Spanish, the assistant State's Attorney asked defendant if he wanted to talk to her. Defendant agreed to speak with her about the murder.

Defendant then agreed to give a written statement. The assistant State's Attorney testified that she wrote the statement, stopping after every few lines to make corrections. She read the statement, pausing after each sentence or phrase for the translation and corrections defendant gave to Montilla in Spanish, which Montilla then translated into English. The assistant State's Attorney testified that the only errors were typographical errors. She further testified that defendant did not sign a page before it was read and translated by Montilla.

At the conclusion of argument on defendant's motion, the trial court denied defendant's motion to suppress the statements and found that the statements were made freely and voluntarily, that defendant was not intimidated by Montilla and that defendant's waiver of his *Miranda* rights was knowing and intelligent.

At trial, Rafael Villa, the victim's brother, testified that he and defendant had been friends for over 20 years and had lived in an apartment together at 1352 North Bosworth Avenue in Chicago until March 1996. Defendant kept his keys to the apartment and returned to visit frequently. On May 18, 1996, at approximately 2 p.m., Villa found defendant in the apartment with a woman, later identified as Alejandrina Gutierrez, and a child. Villa testified that defendant told him that

Gutierrez was selling gold. Villa told defendant that he wanted the woman to leave. Villa testified that defendant "seemed a little upset" because he grabbed a knife used for cutting vegetables from the table, placed it in his back pocket and left the apartment with the woman and child. Before defendant left, Villa told him to leave his keys to the apartment. Defendant refused to leave the keys. Villa told his brother, Socorro Villa, what happened between him and defendant.

On May 19, 1996, Villa, Socorro Villa, Jose-Luis Gallegos and Beto Renteria were in the apartment watching television. Villa testified that he went to sleep about 11 a.m. Later, Renteria woke Villa up and he saw defendant covered in blood with a knife in his hand. Villa then saw his brother collapse. Socorro Villa died minutes later.

On cross-examination, Villa testified that, to his knowledge, there was no animosity between defendant and his brother. Villa was asked on cross-examination whether he told an investigator on July 3, 1996, that after defendant took the knife from the table, he said that he would return it the following day. Villa admitted that defendant said this. Villa also denied drinking prior to his brother's murder and further testified that, when he went to sleep, defendant was not in the apartment.

Dr. Thamrong Chira, a medical examiner in the Cook County medical examiner's office, testified that he performed the autopsy on the victim. Dr. Chira testified that he observed multiple (approximately 16) stab and incise wounds throughout the body, including the head and neck area, chest, abdomen, back and upper extremities. Dr. Chira explained that incise wounds commonly occur from a slashing motion and stab wounds are caused by a thrust directly into the body. Dr. Chira testified that the wounds on the hands and arms were consistent with defense wounds, although it was possible that these wounds were also consistent with a person attacking an individual and that individual stabbing the person who was doing the attacking. Dr. Chira testified that, in his opinion, the victim's death was caused by multiple stab and incise wounds.

Beto Renteria testified that he arrived at the apartment at approximately 11 a.m. on May 19, 1996, and found Socorro Villa, Rafael Villa, and Jose-Luis Gallegos in the apartment. Renteria testified that he drank six to eight beers and ate while watching television. Renteria then fell asleep at the kitchen table while Socorro Villa went to the bedroom to watch television. Renteria was awakened by the arrival of defendant. Defendant told Renteria to shut his mouth as defendant walked into the living room. Renteria heard Socorro Villa ask defendant for the knife he took from the apartment the day before. Defendant said, "I'm going to leave it to you like this you son of a bitch."

Renteria then saw defendant make a thrusting motion with his right hand above the shoulder toward Socorro. Renteria testified that he did not hear Villa call defendant a "pendejo" or any other name. Defendant stabbed Socorro numerous times with a big knife. Socorro pleaded, "Don't hit me anymore, you already killed me." Once Socorro was on the floor, Renteria tried to grab the knife from defendant, but he told Renteria that he would kill him too. On cross-examination, Renteria stated that he did not see whether Socorro struck defendant before defendant stabbed him.

Detective Montilla testified about his interview with defendant on May 22, 1996. After defendant waived his *Miranda* rights, he told Montilla that he took the knife from the table during a visit to the apartment on May 18, 1996. Defendant said that when he returned to the apartment on May 19, 1996, Villa was asleep in a small room, Renteria was sitting at the kitchen table, and Socorro was in another room. Defendant told Montilla that he entered the room and when he attempted to return the knife he had taken the day before, Socorro yelled at him and called him a "pendejo." Montilla testified that defendant told him he took the knife from the left side of his pants and stabbed Socorro two or three times. Socorro then entered the kitchen and defendant stabbed him again. Montilla testified that defendant told him that Socorro grabbed his hair to push him away, which caused defendant to stab him again. Defendant then saw Rafael Villa in the back of the apartment and ran out of the front door. Defendant told Montilla that he dropped the knife near the stairs outside the building and walked to 18th Street, where he threw his clothes into a Dumpster.

Montilla also testified about defendant's interview with the assistant State's Attorney. Montilla testified that he translated each *Miranda* right into Spanish as the assistant State's Attorney read them in English. Defendant indicated that he understood and agreed to talk with the assistant State's Attorney. Montilla translated each of the assistant State's Attorney's questions as she asked them and each of defendant's responses as he gave them. Montilla testified that he had no difficulty translating.

Defendant gave the same statement to the assistant State's Attorney that he gave to Montilla earlier. As the assistant State's Attorney wrote defendant's statement, Montilla translated for defendant. Defendant then listened and agreed that the statement was accurate when Montilla translated the entire statement to him.

On cross-examination, Montilla admitted that he was incorrect when he stated in his direct testimony that defendant never said that Socorro attacked him first. Montilla's notes indicated that defendant

said that he was drinking and watching soccer with Jose-Luis Gallegos, Rafael Villa, and Beto Renteria when Socorro came home and told defendant to leave. Socorro grabbed defendant's hair, pushed him into the wall, and choked him. Defendant stated that, in self-defense, he took the knife from the table and stabbed Socorro. Montilla testified that he was unsure whether he told the assistant State's Attorney that defendant said Socorro attacked him.

The assistant State's Attorney's testimony was very similar to her testimony at the hearing on defendant's motion to suppress. As the assistant State's Attorney began to testify regarding what she learned from her conversation with defendant, defense counsel objected to this line of questioning on the grounds of double hearsay. Defense counsel argued that the assistant State's Attorney did not receive the information as defendant said it, but as Montilla translated it. The trial court found that the testimony from the assistant State's Attorney had sufficient indicia of reliability and allowed her to testify.

The assistant State's Attorney then published defendant's written statement for the jury. The written statement indicated that defendant waived his *Miranda* rights. Defendant's statement revealed that he came to the United States from Mexico 18 years before and that he lived with Rafael Villa, Jose Luis-Gallegos and Beto Renteria in a basement apartment at 1352 North Bosworth Avenue for the past year. Defendant stated that when he moved out of the apartment at the end of April 1996, Socorro Villa moved in. On May 18, 1996, defendant went to the apartment to pick up some of his personal property. Rafael Villa asked defendant to return his set of keys to the apartment, but defendant told him that he left them at his wife's house. Defendant then took a knife with a black handle to replace the knives he had lost, placed it in his waistband and left the apartment.

On May 19, 1996, defendant returned to the apartment. Defendant stated that he intended to return the knife. Socorro asked defendant about the knife and told defendant not to be a "pendejo." Defendant stated that he became angry after this and took the knife from his waistband and stabbed Socorro. Socorro was not holding a knife or any other weapon. Defendant's statement to the assistant State's Attorney did not indicate that Socorro attacked defendant physically. Socorro attempted to flee from defendant. Defendant continued cutting him. Socorro grabbed defendant's hair and tried to push him away. Defendant stated that he continued to cut Socorro with the knife several more times. Defendant's statement indicated that he continued to stab Socorro because "he was mistreating me by calling me names like pendejo and it's offensive." Defendant attempted to leave through the back door, but he saw Rafael Villa and left through the front door

instead. Defendant stated that he threw the knife on the ground, threw his bloodstained clothes in a Dumpster at 18th and Throop Streets and hid for three days because of the crime he committed. The statement included a paragraph which explained that he had been treated well by the police and the assistant State's Attorney.

The statement also indicated that defendant was unable to read, write or speak English and that he agreed to have the statement read to him by the assistant State's Attorney with Montilla translating. Defendant indicated that the statement was a true and accurate account of his statement and that he was allowed to make corrections.

After the State rested, defendant testified that on May 18, 1996, he had gone to the apartment with Gutierrez and her child to buy some gold jewelry. Villa told defendant that Gutierrez had to leave as he did not want prostitutes in his home. Gutierrez then left. Defendant told Rafael Villa that he was going to take the knife as payment for the knives that Villa had lost. Defendant then returned to the apartment the following day to return the knife. Defendant was in the kitchen when Socorro walked in and asked defendant about the knife. Defendant told Socorro that he came back to return it. Defendant testified that Socorro told defendant that he was going to kill him and slapped defendant in the face and grabbed his hair. Defendant further testified that Socorro grabbed defendant's neck and pushed his head against the wall twice. Socorro then kicked defendant in the stomach and twice on the shin and again told defendant that he was going to kill him. Defendant then hit Socorro with the knife. Defendant testified that Socorro had his hands around defendant's neck the entire time. Defendant denied that Socorro put his hand up to block the stabbing and defendant could not explain how Socorro received the wounds on his hand. After Socorro walked away from defendant, defendant left the apartment. Defendant then threw the knife in a hole under a staircase outside the building.

The jury was instructed on first degree murder, self-defense and second degree murder. Following jury deliberations, defendant was found guilty of first degree murder. Following the sentencing hearing, defendant was sentenced to 30 years' imprisonment.

■ On appeal, defendant contends that the testimony of Detective Montilla was not credible and that the statements attributed to defendant should have been suppressed and excluded from evidence as hearsay. We first address the applicable standard of review. The Supreme Court has held that when an appellate court reviews rulings on a motion to suppress involving questions of probable cause, they are reviewed *de novo*. *Ornelas v. United States*, 517 U.S. 690, 134 L. Ed. 2d 911, 116 S. Ct. 1657 (1996). However, the trial court's resolu-

tion of disputed factual issues is entitled to deference on review and will not be disturbed unless manifestly erroneous. *People v. Perez*, 288 Ill. App. 3d 1037, 1043, 681 N.E.2d 137 (1997).

In a very recent case involving a motion to suppress a defendant's confession, our supreme court again analyzed the applicability of *Ornelas*. They held that reviewing courts are to accord great deference to the trial court's factual findings, reversing those findings only when they are against the manifest weight of the evidence. However, we will review *de novo* the ultimate question of whether the confession was voluntary. *In re G.O.*, 191 Ill. 2d 37, 50 (2000).

■ Defendant argues that, in reciting defendant's *Miranda* warnings, Detective Montilla recited his own Spanish language translation of these warnings and that the State failed to produce evidence that the Spanish words Montilla used accurately conveyed the content of the *Miranda* warnings. We hold that defendant has waived this contention for review because he did not raise it in the trial court. *People v. Enoch*, 122 Ill. 2d 176, 190, 522 N.E.2d 1124 (1988).

Notwithstanding waiver, the record reveals that defendant was given *Miranda* warnings on at least three occasions. Officer DeLeon gave defendant *Miranda* warnings in Spanish upon arresting him. There is no evidence in the record that defendant did not understand these warnings when they were recited to him by DeLeon. Defendant was read his *Miranda* rights by Detective Montilla before the initial interrogation and before being questioned by the assistant State's Attorney. Based upon these facts, the testimony adduced at the suppression hearing and at trial was sufficient to support the conclusion that the police advised defendant of his *Miranda* rights after his arrest.

■ Defendant next argues that the State did not establish that defendant voluntarily, knowingly and intelligently waived his rights when he made the statement to the assistant State's Attorney. In determining whether a statement was voluntary, the court must examine whether the statement was made freely and without compulsion or inducement, or whether the defendant's will was overcome at the time he confessed. *People v. Mendoza*, 208 Ill. App. 3d 183, 199, 567 N.E.2d 23 (1991).

Defendant specifically argues that the English-Spanish language barrier affected the voluntariness of his statements. We reject defendant's argument. The record reveals that the State presented testimony that defendant was informed of his constitutional rights in Spanish. Montilla and the assistant State's Attorney both testified that as defendant gave his statement in Spanish, Montilla translated to English and the assistant State's Attorney wrote the statement in English. Once the statement was written, Montilla translated each

sentence to Spanish for defendant and asked if the sentence was correct. Any corrections were made sentence by sentence. Montilla then read the entire corrected statement to defendant in Spanish with defendant signing the written statement and initialing the bottom of each page. We further note that there is no evidence in the record to suggest that defendant had difficulty understanding Montilla or that he expressed a desire for a different interpreter. As to defendant's assertion that he thought the assistant State's Attorney was his lawyer because Montilla said she was a "lawyer for the State," this exact argument was rejected by this court in *People v. Teran-Cruz*, 272 Ill. App. 3d 573, 578, 650 N.E.2d 663 (1995). Based upon this evidence, we hold that the trial court's ruling that defendant's statement was voluntarily made was not erroneous.

■ Defendant next argues that his confession should have been excluded as hearsay because the assistant State's Attorney published the statement when the statement was Montilla's translation of defendant's statement. Therefore, Montilla was the proper person to publish the statement. Defendant relies on the holding in *People v. Torres*, 18 Ill. App. 3d 921, 310 N.E.2d 780 (1974). In *Torres*, a police officer testified to a statement made by the wife of the defendant relating to a shooting by the defendant. The statement was made at the scene of the shooting and was in Spanish, which was translated to the officer by a bystander. At trial, the officer testified to the contents of the statement even though the bystander did not testify as to the translation. This court held that, at most, this amounted to harmless error as the defendant's wife did testify at trial regarding the shooting. *Torres*, 18 Ill. App. 3d at 929.

In the instant case, the record establishes that Montilla was fully cross-examined regarding his involvement in translating defendant's statement and the substance of defendant's statement. Montilla discussed in great detail the process of obtaining the statement from defendant. Montilla further testified that defendant gave the same statement, with more details, to the assistant State's Attorney, as he had given earlier to Montilla. We hold that defendant was not prejudiced by the assistant State's Attorney's act of publishing his statement to the jury and that the statement was therefore properly admitted. See *People v. Grisset*, 288 Ill. App. 3d 620, 630-31, 681 N.E.2d 1010 (1997). However, we must emphasize that unless the person who acts as the interpreter testifies as to the taking of the statement, the statement is inadmissible hearsay. *Torres*, 18 Ill. App. 3d at 928-29.

■ Defendant also argues, for the first time on appeal, that his statement should be suppressed due to an alleged violation of the Vienna Convention. Defendant asserts that, as a Mexican national, his

rights were violated because he was not advised of his right to contact the Mexican consulate for assistance prior to interrogation pursuant to article 36 of the Vienna Convention (Vienna Convention, art. 36, 21 U.S.T. 77, 100, 596 U.N.T.S. 261). Article 36(b) of the Convention provides in relevant part:

> "If he so requests, the competent authorities of the receiving State shall without delay, inform the consular post of the sending State if, within its consular district, a national of that State is arrested or committed to prison or to custody pending trial or is detained in any other manner. Any communication addressed to the consular post by the person arrested, in prison, custody, or detention shall also be forwarded by the said authorities without delay. The said authorities shall inform the person concerned without delay of his rights under this sub-paragraph." Vienna Convention, art. 36(b), 21 U.S.T. 77, 100-01, 596 U.N.T.S. 261.

As defendant failed to raise this issue during the suppression hearing or at trial, he urges us to review the contention under the plain error doctrine. Where an alleged error is one affecting substantial or fundamental rights, we may consider the issue on appeal, waiver notwithstanding, under the plain error doctrine. *People v. Grant*, 232 Ill. App. 3d 93, 106, 596 N.E.2d 813 (1992). While the Convention arguably confers on an individual the right to consular assistance following arrest (see *Breard v. Greene*, 523 U.S. 371, 376, 140 L. Ed. 2d 529, 538, 118 S. Ct. 1352, 1355 (1998); *United States v. Chaparro-Alcantara*, 37 F. Supp. 2d 1122, 1125 (C.D. Ill. 1999)), article 36 does not create a fundamental right and courts have explicitly refused to equate the violation of article 36 with a *Miranda* violation. *Waldron v. Immigration & Naturalization Services*, 17 F.3d 511, 518 (2d Cir. 1993); *United States v. Esparza-Ponce*, 7 F. Supp. 2d 1084, 1097 (S.D. Cal. 1998); *Chaparro-Alcantara*, 37 F. Supp. 2d at 1125.

As the Fourth Circuit Court of Appeals recently noted: "Although states may have an obligation under the Supremacy Clause to comply with the provisions of the Vienna Convention, the Supremacy Clause does not convert violations of treaty provisions (regardless whether those provisions can be said to create individual rights) into violations of constitutional rights. Just as a state does not violate a constitutional right merely by violating a Federal statute, it does not violate a constitutional right merely by violating a treaty." (Emphasis omitted.) *Murphy v. Netherland*, 116 F.3d 97, 99-100 (4th Cir. 1997). This court agrees with the analysis in *Murphy* and concludes that the plain error doctrine is inapplicable to the instant case as no violation of a fundamental right is implicated. Also see *United States v. Ademaj*, 170 F.3d 58 (1st Cir. 1999) (holding that an alleged violation of the Convention would not be considered plain error on appeal).

Even if defendant's contention was properly raised, we would still reject it. Defendant relies on *United States v. Lombera-Camorlinga*, 170 F.3d 1241 (9th Cir. 1999), to support his contention that he had a mandatory and unequivocal right to be informed of the availability of consular assistance and that violation of this right could lead to suppression of his statement. However, this decision was withdrawn by the ninth circuit by *United States v. Lombera-Camorlinga*, 188 F.3d 1177 (9th Cir. 1999).

In *United States v. Esparza-Ponce*, the First Circuit Court of Appeals rejected the argument of the defendant that, as with a *Miranda* violation, prejudice should be presumed when law enforcement officials do not inform a foreign national that he has a right to contact his national consulate. It cited the second circuit's holding in *Waldron v. Immigration & Naturalization Services*, and the fifth circuit's holding in *Faulder v. Johnson*, 81 F.3d 515 (5th Cir. 1996), *cert. denied*, 519 U.S. 995, 136 L. Ed. 2d 380, 117 S. Ct. 487 (1996), in requiring a party seeking relief under the Convention to show actual prejudice in order to be entitled to that relief. *Esparza-Ponce*, 7 F. Supp. 2d at 1097.

To establish prejudice, a defendant must show that: (1) he did not know of his right to contact the consulate for assistance; (2) he would have availed himself of the right; and (3) there was a likelihood that the consulate would have assisted defendant. *Chaparro-Alcantara*, 37 F. Supp. 2d at 1126; *United States v. Tapia-Mendoza*, 41 F. Supp. 2d 1250, 1254 (D. Utah 1999). Applying this test to the instant case, defendant has not established prejudice. Defendant has failed to assert that he would have exercised his right to speak with the consulate and would have exercised his fifth amendment rights after speaking with the Mexican consulate. Indeed, there is nothing in the record to suggest that defendant contacted the consulate once he was made aware of his right to do so. See *Esparza-Ponce*, 7 F. Supp. 2d at 1097.

Defendant was notified of his *Miranda* rights in Spanish, and he freely acknowledged that he understood those rights and that he was willing to answer questions in waiver of those rights. Defendant has also failed to assert that there is any likelihood that the Mexican consulate would have assisted him had he contacted it. Based on the record, it is too speculative to conclude that defendant was prejudiced by the officers' failure to advise him of his right to consular notification or assistance.

In *United States v. Alvarado-Torres*, 45 F. Supp. 2d 986 (S.C. Cal. 1999), the court considered just how the terms of the Convention would be applied when a foreign national was arrested for a criminal offense. The court first noted that the Convention does not require law enforcement officers to allow a foreign national to contact a con-

sular representative before they begin an interrogation. Further, even if the foreign national requests to contact the consulate after being arrested, the Convention does not require that the officers delay their interrogation until contact is made. The court looked at the State Department's interpretation of the Convention. The State Department has indicated that officials comply with the notification requirement by notifying the foreign national of his right to contact the consulate before he is booked for detention. Officers would comply with the Convention by contacting the consulate within 24 hours, or even as late as 72 hours, of the foreign national's request. The State Department has noted that the Vienna Convention does not require that the consulate be notified outside of its regular working hours. *Alvarado-Torres*, 45 F. Supp. 2d at 991.

We also note that the Convention does not expressly or impliedly provide for the suppression of statements or other evidence as a remedy where a police officer or other arresting authority fails to notify a foreign national of the right to contact the consulate. See *Tapia-Mendoza*, 41 F. Supp. 2d at 1255. Because of this, several courts have held that even if a defendant could show prejudice resulting from law enforcement authorities' failure to conform to the Convention, suppression of a statement or other evidence is not available as a remedy. *United States v. Li*, 206 F.3d 56 (1st Cir. 2000); *United States v. Torres-Del Muro*, 58 F. Supp. 2d 931 (C.D. Ill. 1999); *United States v. Carrillo*, 70 F. Supp. 2d 854 (N.D. Ill. 1999); *United States v. Rodrigues*, 68 F. Supp. 2d 178 (E.D.N.Y. 1999). The only court case providing for suppression of statements taken in violation of the Convention is *State v. Reyes*, where the Delaware Superior Court based its holding in *Lombera-Camorlinga*, prior to that case being withdrawn by the ninth circuit. It is well established that the exclusionary rule is applied generally to deter the police from violating a person's constitutional rights. See, e.g., *Elkins v. United States*, 364 U.S. 206, 217, 4 L. Ed. 2d 1669, 1677, 80 S. Ct. 1437, 1444 (1960) ("[the exclusionary rule's] purpose is to deter—to compel respect for the constitutional guaranty in the only effective available way—by removing the incentive to disregard it"). *Mapp v. Ohio*, 367 U.S. 643, 6 L. Ed. 2d 1081, 81 S. Ct. 1684 (1961). As shown in the discussion above, every court that has addressed this issue has held that any rights created by the Convention cannot be equated with constitutional rights, fundamental rights, or with rights under *Miranda*. It would therefore be illogical to extend the remedy of the exclusionary rule to violations of the Convention. We decline to imply the existence of such a remedy and hold that suppression is not available under the Vienna Convention.

Accordingly, the judgment of the circuit court of Cook County is

affirmed. The sentencing order is modified to reflect that defendant will receive day-for-day good conduct credit.

Affirmed.

HARTMAN and GREIMAN, JJ., concur.