THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. JESUS FIDEL MORALES, Defendant-Appellant.

First District (4th Division)    No. 1—99—0033

Opinion filed March 28, 2002.

Andrea D. Lyon, of Chicago and Ann Arbor, Michigan, for appellant.

Richard A. Devine, State's Attorney, of Chicago (Renee Goldfarb, Linda Woloshin, and Sari London, Assistant State's Attorneys, of counsel), for the People.

JUSTICE THEIS delivered the opinion of the court:

Following a jury trial, defendant was convicted of first degree murder, solicitation to commit murder for hire, and conspiracy to commit murder. Defendant waived a jury for the sentencing phase of trial, where he was found eligible for the death penalty. The trial court found mitigating factors to preclude the imposition of the death penalty and sentenced defendant to natural life imprisonment without the possibility of parole. Defendant now appeals, arguing that (1) his counsel had a conflict of interest in representing both defendant and a witness against him; (2) the trial court erred in denying his motion to suppress his statement as involuntary based on his inability to speak English, medical condition, sleep deprivation and improper diet; (3) defendant was denied his right to a fair trial, due process and his right to confront witnesses by the trial court's undue restriction on cross-examination, inadequate *voir dire* and disrespectful treatment of

defense counsel in the jury's presence; (4) defendant was denied his right to effective assistance of counsel; and (5) defendant was not properly convicted because the jury was not sworn to try the case. For the following reasons, we reverse and remand for a new trial.

Defendant's conviction arose from the fatal shooting of Kedric Bell on January 16, 1995. At the hearing on defendant's motion to suppress his statement, Detectives Bribiesca and McWeeny of the Chicago police department testified that on March 21, 1996, they gave defendant his *Miranda* rights in Spanish and English, and defendant responded in both languages that he understood those rights. McWeeny then interviewed defendant mainly in English, with Bribiesca translating about 20% to 25% of the questions into Spanish. Both detectives testified that defendant did not display an inability to understand what they said.

At the 5 p.m. interview, defendant told them that he was a diabetic, that he was feeling fine, but would soon need medication. The police transported defendant to St. Anthony's Hospital for insulin at midnight, returning to the station around 1 a.m. when defendant ate hamburgers. Bribiesca, Assistant State's Attorney Lyman, and McWeeny then "Mirandized" defendant in English and Spanish before interviewing defendant again. Lyman testified that defendant stated he was feeling fine. Lyman read defendant's statement aloud as he wrote it, and after he finished, Bribiesca read it to defendant in Spanish. Defendant was allowed to make corrections before signing the statement.

Bribiesca, McWeeny, and Lyman testified that defendant did not appear to be in medical distress and never complained about his physical condition. Lyman and Bribiesca stated that defendant did not appear tired. The police gave defendant hamburgers, diet soda, fruit, coffee and water and defendant did not request any other food. Bribiesca and McWeeny denied that McWeeny told defendant he could have insulin only after the interview or that anyone told defendant that he would not receive any medical treatment until he admitted his involvement in the murder. On cross-examination, Lyman stated that defendant had a Spanish accent, but he spoke English in full sentences and appeared to understand English well.

Detective Robert Rose of the New York City police department testified that defendant had an accent but was fluent in English. Detective Jorge Sanchez and Sergeant Michael Conroy with the New York City police department stated that defendant was able to communicate in English.

Dr. Taladriz Arturo testified for the State that he reviewed defendant's medical records from St. Anthony's and Cook County

Hospital. When defendant arrived at St. Anthony's at midnight, his sugar level was a little high, but after receiving insulin and eating something, like hamburgers and fruit, Arturo opined that defendant would be fine. Defendant was stable with no complaints when released at 1 a.m. Dr. Arturo testified that defendant did not develop diabetic ketosis until 11 a.m. at Cook County Hospital and never suffered from the more serious condition, ketoacidosis. Ketosis was not life threatening, but would affect his ability to concentrate and might affect brain functioning. Based on this diagnosis, Dr. Arturo testified that defendant needed insulin and intravenous fluids, which he received.

Dr. William Buckingham testified for the defense that when defendant was admitted to Cook County Hospital at 9:30 a.m. on March 22, he had developed diabetic ketoacidosis, the forerunner to a diabetic coma. This was a life-threatening condition that could cause dizziness, shortness of breath, mental confusion, and loss of consciousness. He opined that the development of ketoacidosis took several hours and occurred between the period of the St. Anthony's discharge and admission to Cook County Hospital. He stated that a person in defendant's condition at 9:30 a.m. would not have been able to make a knowing and willful statement and could not knowingly have determined whether to speak to the police.

Robert Page, Michael Childs, Sharon Jantolak, Ronald Motley and Irving Wilson testified for the defense that, based on their experiences with defendant at Cook County jail, defendant could not speak English well and had to use gestures or an interpreter to communicate.

Defendant testified through a Spanish interpreter that after arriving in Chicago on March 21, 1996, the officers fed him a baloney sandwich, fruit, hamburgers and coffee. Defendant stated that he understood Spanish during the interviews, but he could not speak or understand English. He also stated that he did not receive much sleep during the days before the interviews.

Later that evening, defendant started to feel ill and told Bribiesca several times that he could not answer any questions. He felt so ill that he no longer understood what they were saying or what he was saying. Defendant testified that he did not know what the statement said and signed it only because they told him if he did, they would take him to the hospital. On cross-examination, defendant admitted that it was possible that Bribiesca read the statement to him in Spanish but that he did not understand it because of his condition. Defendant testified that he did not make many of the statements contained in his confession.

The State admitted in rebuttal a certified conviction where defendant pled guilty in Florida to conspiracy to export stolen vehicles and

exportation of stolen vehicles. The parties stipulated that a language expert would testify that he evaluated defendant on November 12, 1997, and found that his vocabulary was sufficient for only handling simple, elementary needs and he could only participate in basic conversations.

The trial court made no factual findings before ruling that the statement was voluntary.

The following relevant testimony was adduced at trial. Lyman published defendant's statement, where defendant stated that in October 1994, Jorge Hernandez, the brother of his girlfriend, Olga Medina, gave defendant 22 kilograms of cocaine to sell. After defendant sold the narcotics, Hernandez sent a Columbian male to Chicago to collect the money owed, approximately $400,000. In November 1994, Hernandez sent defendant another 22 kilograms to sell. Defendant sold 11 by Christmas but was robbed of the remaining 11 kilograms. Hernandez then sent a Columbian woman to collect the money from defendant. Defendant paid her for the drugs he sold, but he still owed Hernandez $200,000. Over the next several weeks, Hernandez called him repeatedly asking for the money. On January 14, 1995, Hernandez told defendant that he was sending someone to Chicago to collect the rest of the money. Defendant responded that he would have the money and deliver it the next day. On January 15, 1995, Hernandez sent the victim, Kedric Bell, to collect the money. Once Bell arrived, he called defendant several times asking for the money and defendant replied that he would have it the next day. However, defendant lacked the money to pay Bell and asked Alexis Paredero to help him make it look like Bell had been paid and then robbed. Paredero told defendant that after they robbed Bell, they would kill him. The two men met with Malcolm Ortiz and Antonio Rosado, chose "snake alley" for the robbery, and decided that Paredero would drive Bell to the alley, where Rosado and Ortiz would pretend to be police officers and arrest them. Paredero left defendant between 10 p.m. and 11 p.m. on January 15 after defendant paid him $10,000. Defendant spent that night at his house with Medina, Luis Garcia and Armondo. The next morning, Hernandez called him and told him that Bell had been killed.

Sergio Montero testified that his sentence for drug offenses was reduced when he agreed to testify against defendant. In late January or February 1995, defendant told him that he owed Hernandez $500,000. Montero also overheard Ortiz and Rosado asking defendant for more money for the Chicago murder and defendant replying that he had already paid them.

Debbie Perez, Paredero's wife, testified that she has been convicted

and sentenced on drug charges and required to cooperate with the authorities. When she worked for defendant in late 1994, he told her that he was under pressure because he owed money to his distributor, Hernandez, and he feared for his and his family's lives. Defendant stated that he would have to "deal with" the next person Hernandez sent to collect the money. When Paredero returned home early on January 16, 1995, Paredero told her that something went wrong, the guy was dead, and mentioned that he, defendant, Ortiz, and Rosado were involved.

McWeeny, Bribiesca, and Lyman again testified to the circumstances surrounding defendant's statement. McWeeny also testified that he obtained phone records from the victim's cell phone which showed calls to Ortiz, Paredero, and Humberto Santin. During his first interview with defendant in New York, defendant admitted to McWeeny that he was involved in the drug business and knew Ortiz, Paredero, Perez, and Hernandez. He also admitted using Santin's cell phone. Defendant told McWeeny that Hernandez was mad at him because Hernandez thought he knew about Bell's murder. After McWeeny confronted defendant with Montero's statement, defendant stated that he was involved in the robbery but did not know that Bell would be killed. Defendant stated that Bell had been sent to Chicago to collect $200,000 from him for Hernandez. He stated that he, Paredero, Rosado, and Ortiz planned that they would pretend to be police officers and rob Bell so that Hernandez would believe that it was a random robbery by gang members.

Paredero testified that he was in prison for Bell's murder and agreed to testify against his codefendants. In early January 1995, defendant told Paredero that Hernandez was threatening him and his family because defendant owed Hernandez money. Hernandez then sent Armondo to Chicago to collect the money but left after giving defendant an extension. Defendant stated that he would have to kill the next person who arrived to collect the money and asked Paredero if he knew anyone to help. Paredero contacted Ortiz, who said he would do it for $10,000. On January 15, 1995, defendant seemed distraught and told Paredero that they were continually pressuring him and that he would have to kill Bell. Defendant told Ortiz and Paredero that he wanted to make the murder look like a robbery and told them to take Bell's cell phone, pager and wallet. After defendant paid Ortiz, they decided to have Rosado and Ortiz act as police officers and kill Bell execution style, with a gunshot to the back of the head. Defendant instructed Paredero to make sure Bell did not survive because if he did, "everybody [would be] dead." Paredero then drove Bell to the alley where Rosado and Ortiz stopped the car, yelled "police," and

frisked Bell and Paredero before Ortiz shot Bell in the head. Paredero drove home and called defendant from Bell's cellular phone to tell him it was done.

Sharon Jantolak and Irving Wilson testified for the defense that it was difficult to communicate with defendant in English. The grand jury testimony of Madeline Rivera was then read into the record. She stated that she was at home with her fiancé, Ortiz, at 12:45 a.m. on January 16, 1995, when Rosado, Paredero and defendant arrived. Rivera stood in the kitchen and defendant stayed in the doorway while Paredero, Ortiz and Rosado were in the dining room discussing robbing and killing a man from Florida. Detectives Wong and Sanchez of the New York City police department testified in rebuttal that defendant was able to speak English.

Defendant was convicted of first degree murder, solicitation of murder for hire, and conspiracy to commit murder and sentenced to natural life imprisonment without parole. His motions for a new trial and to reduce his sentence were denied. Defendant then filed this timely appeal.

We first address defendant's contention that his attorney had a *per se* conflict of interest where he represented both defendant and a witness against him, Hernandez, and that defendant did not make a knowing and intelligent waiver of this conflict. The State responds that Hernandez was not a witness against defendant, there was no conflict, defendant was not deprived of his counsel's undivided loyalty and he actually benefitted from defense counsel's knowledge of Hernandez. Even if there were a conflict, the State argues, defendant was apprised of the conflict and made a knowing and adequate waiver.

The record reveals that Michael Blacker, defendant's attorney from Florida, represented defendant in this murder trial and simultaneously also represented Hernandez on federal drug charges in Florida. The assistant State's Attorney disclosed this potential conflict of interest to the trial court before the motion-to-suppress hearing, stating that Hernandez "is somewhat related to this case, who could potentially be a witness for the State in its case in chief, and even more likely perhaps in aggravation if this case would proceed *** for a death penalty sentencing." Hernandez, represented by Blacker, was in the process of negotiating a plea agreement that would involve his cooperation with federal authorities. The State further asserted that Hernandez would very likely enter into this plea. The State spoke with the federal authorities regarding Hernandez's cooperation and stated that Hernandez would possibly testify in several matters, but did not clarify in which cases Hernandez would likely testify. The State acknowledged that "there would be a possibility of a potential at

least for conflict if the State does *** call Mr. Hernandez or talk to Mr. Hernandez regarding matters against Mr. Morales' interest." Blacker remained silent during this discussion.

Hernandez was not listed on the potential witness list read to the jury during *voir dire*, and during the disposition of pretrial motions, the State informed the court that it did not intend to admit any statements made by Hernandez in its case in chief. The State's theory of the case, however, was that defendant conspired with and hired Ortiz, Rosado and Paredero to kill Bell, Hernandez's associate sent to collect money from defendant because defendant could not pay Hernandez the money he owed. Hernandez's involvement in this case was addressed by both parties in opening statements through closing arguments and by nearly every witness at trial.

While Hernandez did not testify against defendant at trial, a letter written by Hernandez to his Columbian drug supplier was read into evidence by Drug Enforcement Agency Agent Minelli against defendant at the death penalty hearing. The letter, dated September 17, 1995, describes Hernandez's instructions regarding the continuation of his narcotics activity in the United States after his arrest. Hernandez explained that defendant and Medina were in charge of Hernandez's drug operation while he was in jail. He assured his supplier that defendant and Medina would offer the same services as when Hernandez ran the business because they kept all of Hernandez's connections, equipment, and clients. Agent Minelli testified that during the period of time when defendant and Medina ran Hernandez's drug operation, defendant received approximately 300 to 400 kilograms of cocaine. Through cross-examination of Agent Minelli, defense counsel attacked Hernandez's credibility by arguing that he might be mentally unstable and lacked the capacity to fully participate in his own trial. In its closing arguments, the State focused on defendant's participation in Hernandez's drug business while Hernandez was incarcerated and the fact that defendant distributed drugs throughout the country.

The sixth amendment right to effective assistance of counsel entitles criminal defendants to the undivided loyalty of counsel, free from conflicting interests or inconsistent obligations. *People v. Moore*, 189 Ill. 2d 521, 537-38, 727 N.E.2d 348, 357 (2000). When addressing whether a conflict of interest exists, the trial court must rule, "not with the wisdom of hindsight after the trial has taken place, but in the murkier pretrial context when relationships between parties are seen through a glass, darkly." *Wheat v. United States*, 486 U.S. 153, 162, 100 L. Ed. 2d 140, 151, 108 S. Ct. 1692, 1699 (1988); *People v. Holmes*, 141 Ill. 2d 204, 223, 565 N.E.2d 950, 958 (1990). Therefore, when reviewing the alleged conflict of interest on appeal, we view the situa-

tion as the trial court did before trial. *Wheat*, 486 U.S. at 164, 100 L. Ed. 2d at 152, 108 S. Ct. at 1700.

In this case, we are asked to decide an issue of first impression, whether a *per se* conflict exists where a defense attorney contemporaneously represents defendant and a potential witness against him. The answer lies within the distinction our supreme court has drawn between the two classes of conflicts of interest. *People v. Spreitzer*, 123 Ill. 2d 1, 14-19, 525 N.E.2d 30, 34-37 (1988).

■ The first class involves *per se* conflicts, a term first used by the Illinois Supreme Court in *People v. Coslet*, 67 Ill. 2d 127, 364 N.E.2d 67 (1977). In a *per se* conflict, certain facts about a defense counsel's status, by themselves, engender a disabling conflict. *Moore*, 189 Ill. 2d at 538, 727 N.E.2d at 357. Such a conflict exists where defense counsel has some tie to a person or entity that would benefit from an unfavorable verdict for defendant. *Moore*, 189 Ill. 2d at 538, 727 N.E.2d at 357. *Per se* conflicts are created in cases where defense counsel has a prior or contemporaneous association with either the victim or the prosecution. *Spreitzer*, 123 Ill. 2d at 14, 525 N.E.2d at 34. These situations are " 'too fraught with the dangers of prejudice, prejudice which the cold record might not indicate, that the mere existence of the conflict is sufficient to constitute a violation' " of defendant's rights, regardless of whether it in fact influenced the attorney or the outcome of the case. *People v. Stoval*, 40 Ill. 2d 109, 113, 239 N.E.2d 441, 443 (1968), quoting *United States v. Myers*, 253 F. Supp. 55, 57 (E.D. Pa. 1966). The interests of the two parties are so directly at odds that an impending conflict is apparent and obvious and may affect counsel's performance subliminally in ways difficult to detect and demonstrate. *People v. Lawson*, 163 Ill. 2d 187, 210, 644 N.E.2d 1172, 1183 (1994); *People v. Sims*, 322 Ill. App. 3d 397, 413-14, 750 N.E.2d 320, 333 (2001). "[S]ound policy disfavors the representation of an accused *** by an attorney with possible conflict of interests." *Stoval*, 40 Ill. 2d at 113, 239 N.E.2d at 444. Therefore, prejudice is presumed and the inherent conflict warrants reversal absent defendant's knowing waiver of his right to conflict-free counsel. *Spreitzer*, 123 Ill. 2d at 14-16, 525 N.E.2d at 34-35.

The second class of conflicts generally involves joint or multiple representation of codefendants. *Spreitzer*, 123 Ill. 2d at 17, 525 N.E.2d at 36. In these situations, there is always a possibility of a conflict because the interests of the codefendants may diverge or clash, but this possibility alone is insufficient to constitute a reversible conflict. See *Cuyler v. Sullivan*, 446 U.S. 335, 348, 64 L. Ed. 2d 333, 346, 100 S. Ct. 1708, 1718 (1980). Frequently, codefendants' interests remain compatible, and as long as those interests remain constant, counsel

can represent both defendants. *Sims*, 322 Ill. App. 3d at 414, 750 N.E.2d at 333-34. Unlike in *per se* conflicts, the asserted conflict does not involve the directly opposing interests of two clients. *Spreitzer*, 123 Ill. 2d at 21, 525 N.E.2d at 37. In these cases where counsel's continued contemporaneous representation is challenged, we can easily detect whether the potential for conflict ever materialized into an actual conflict that prejudiced someone's interests. *Sims*, 322 Ill. App. 3d at 414, 750 N.E.2d at 334. The mere possibility of this type of conflict cannot be treated as *per se*, because to so hold would preclude multiple representation entirely "even in cases where ' "[a] common defense ... gives strength against a common attack." ' " *Cuyler*, 446 U.S. at 348, 64 L. Ed. 2d at 346, 100 S. Ct. at 1718, quoting *Glasser v. United States*, 315 U.S. 60, 92, 86 L. Ed. 680, 710-11, 62 S. Ct. 457, 475 (1942) (Frankfurter, J., dissenting), *superseded on other grounds by statute as recognized in Bourjaily v. United States*, 483 U.S. 171, 181, 97 L. Ed. 2d 144, 156, 107 S. Ct. 2775, 2781 (1987); *Spreitzer*, 123 Ill. 2d at 17, 525 N.E.2d at 36. In some of these situations, defendant must show actual prejudice and demonstrate how his attorney's performance was affected by the conflict. *Spreitzer*, 123 Ill. 2d at 17, 525 N.E.2d at 36.

■ Therefore, based on this distinction between the two classes of conflicts, we find that a *per se* conflict was created in this case, where defense counsel contemporaneously represented a potential State witness, even though that witness did not testify against defendant at trial. Several other cases also suggest this interpretation. *Lawson*, 163 Ill. 2d at 217-18, 644 N.E.2d at 1186 (finding that a "possible conflict of interests existed" dictating "application of a *per se* rule"); *People v. Barrow*, 133 Ill. 2d 226, 254, 549 N.E.2d 240, 252 (1989) (affirming the trial court's disqualification of one of defendant's attorneys where "a potential conflict of interest existed *** which may have precluded [the attorney] from properly cross-examining certain witnesses the State indicated it may call at trial"); *People v. Thomas*, 131 Ill. 2d 104, 111, 545 N.E.2d 654, 657 (1989) (stating that defendant need not show prejudice under the *per se* rule where his attorney had "an actual or possible conflict of professional interests"); *People v. Franklin*, 75 Ill. 2d 173, 176, 387 N.E.2d 685, 686 (1979) (noting that the *per se* rule provides that "where defense counsel is involved in an actual or potential conflict of interest, it is unnecessary for the defendant to establish actual prejudice"); *People v. Kester*, 66 Ill. 2d 162, 167-68, 361 N.E.2d 569, 572 (1977) (holding that a potential conflict was present, necessitating reversal of defendant's conviction).

Here, at the time the issue was brought before the trial court, Blacker contemporaneously represented defendant and Hernandez.

The State informed the court that Hernandez might be a witness against defendant in the State's case in chief or at sentencing, recognizing that Blacker's representation of both parties created a conflict. If the State had called Hernandez to testify, both parties concede that a *per se* conflict would have developed. Analyzing the situation with the facts before the trial court when the issue first arose, we find this situation created a potential *per se* conflict. We cannot know definitively whether Blacker's dual representation of defendant and Hernandez led Blacker to avoid certain areas of cross-examination, influenced his decision to call witnesses in defendant's defense, or otherwise subliminally affected his role as defendant's advocate in ways difficult to detect and demonstrate. *Lawson*, 163 Ill. 2d at 210, 644 N.E.2d at 1183; *Spreitzer*, 123 Ill. 2d at 16, 525 N.E.2d at 35. It is evident that Hernandez was a person who could likely benefit from an unfavorable verdict for defendant. Hernandez's and defendant's interests would inevitably collide, resulting in an obvious, inherent conflict which constituted a *per se* violation of defendant's sixth amendment rights.

Other facts present in this case further support our holding. Blacker simultaneously represented Hernandez in negotiating plea agreements with federal authorities in exchange for his cooperation and testimony in other cases. The assistant State's Attorney represented that he spoke with federal authorities regarding this pending plea agreement and stated that Hernandez would testify in other matters, implying that he could testify against defendant. Hernandez was an integral part of the State's theory of the case that Hernandez supplied defendant with kilograms of cocaine to sell and sent Bell to Chicago to collect money owed from defendant, and because defendant did not want to pay Hernandez, he hired Ortiz and Rosado to kill Bell. Hernandez's involvement in the drug trade and his relationship with defendant permeated the testimony of almost every witness at trial. Hernandez's letter regarding defendant's participation in and control over Hernandez's drug operation while he was incarcerated was used by the State to seek the death penalty for defendant. The testimony at trial revealed that Hernandez was angry with defendant because he did not pay the $200,000 and Hernandez thought that defendant knew about Bell's murder. Defendant was afraid of Hernandez, was threatened by him, and feared for his and his family's lives.

Further, another situation developed during trial which is further evidence of the conflict between Hernandez and defendant, one which neither party raised on appeal. Before the State called Bell's cousin, Robert Ross, Blacker requested a sidebar. He informed the court that he had interviewed Ross's sister and may have spoken with Ross

regarding representing him in appealing the denial of his motion to suppress. The police recovered several kilograms of cocaine and several thousand dollars in this search of Ross's apartment, which led to Hernandez's and Ross's arrest. The court ruled that Blacker could not cross-examine Ross as to the circumstances surrounding this arrest and search. Blacker then explained this restriction to defendant, who agreed to allow Blacker to cross-examine Ross with these limitations. Based on all of this evidence concerning the relationship between Hernandez and defendant, we find that Blacker's dual representation of Hernandez and defendant created a *per se* conflict of interest.

■ When the trial court became aware of the *per se* conflict of interest when Blacker represented both defendant and Hernandez, it was obligated to ascertain the extent of the risk and take any measures necessary to protect defendant's right to effective assistance of counsel. *Thomas*, 131 Ill. 2d at 111, 545 N.E.2d at 656. The record reveals that after the State brought this potential conflict to the court's attention, it asked the court to inquire of defendant whether he understood the conflict and wanted Mr. Blacker to continue to represent him. The following colloquy occurred:

> "THE COURT: Mr. Morales, do you understand what the assistant [S]tate's [A]ttorney has just stated?
> THE DEFENDANT: Yes.
> THE COURT: Knowing of the possible conflict in regard to your attorney representing Mr. Hernandez, do you understand that?
> THE DEFENDANT: Yes, sir.
> THE COURT: Knowing that, do you still wish for your attorney, Mr. Blacker, to represent you in this matter?
> THE DEFENDANT: Yes, sir."

The determination of whether defendant has knowingly and intelligently waived his right to conflict-free counsel depends on the particular facts and circumstances of the case, considering the defendant's background, experience, and conduct. *People v. Becerril*, 307 Ill. App. 3d 518, 525, 718 N.E.2d 1025, 1029-30 (1999). Because this right is fundamental, courts indulge " ' "every reasonable presumption against *** [its] waiver." ' " *Lawson*, 163 Ill. 2d at 209, 644 N.E.2d at 1182, quoting *People v. Fife*, 76 Ill. 2d 418, 423, quoting *Glasser*, 315 U.S. at 70, 86 L. Ed. at 699, 62 S. Ct. at 465. In order to waive the right to conflict-free counsel, the court must admonish defendant regarding the existence and significance of the conflict. *Lawson*, 163 Ill. 2d at 218, 644 N.E.2d at 1187; *People v. Williams*, 226 Ill. App. 3d 188, 192, 589 N.E.2d 695, 698 (1992). "A defendant must actually understand how the conflict could affect his attorney's representation, before his right to a conflict-free attorney can be knowingly waived." *People v.*

*Coleman,* 301 Ill. App. 3d 290, 301, 703 N.E.2d 137, 145 (1998). There must be a strong showing of an intentional and knowing waiver. *People v. Taylor,* 165 Ill. App. 3d 1016, 1020, 520 N.E.2d 907, 911 (1988). See also *People v. Robinson,* 79 Ill. 2d 147, 166, 402 N.E.2d 157, 166 (1979).

■ Here, we find that defendant's waiver was not knowing and intelligent. Defendant was merely informed that Blacker also represented Hernandez and asked whether he wanted Blacker to continue to defend him. The judge should have questioned defendant further regarding his understanding of this conflict to ensure that defendant fully understood the significance of Blacker's conflicting loyalties and how these loyalties could impair Blacker's effectiveness. *People v. Washington,* 101 Ill. 2d 104, 114, 461 N.E.2d 393, 398 (1984); *Coleman,* 301 Ill. App. 3d at 301, 703 N.E.2d at 145. From this record, there is nothing to show that defendant, with his education and background, understood the nature of the conflict and its possible effect upon Blacker's performance. Our supreme court recognized the difficulty in adequately explaining the effect of a conflict to a defendant, stating that " '[I]t is difficult, if not impossible, to satisfactorily advise a defendant of the subtle effect which a conflict of interests may have upon *** counsel's representation.' " *Washington,* 101 Ill. 2d at 114-15, 461 N.E.2d at 398, quoting *People v. Meyers,* 46 Ill. 2d 149, 152, 263 N.E.2d 81, 82-83 (1970). Under these circumstances, we cannot say that defendant knowingly surrendered his right to a conflict-free attorney. We therefore reverse and remand for a new trial.

After thoroughly reviewing the evidence, we are convinced that it was sufficient to support a finding of guilt beyond a reasonable doubt. Under these circumstances, a retrial of defendant would not violate double jeopardy principles. *Lawson,* 163 Ill. 2d at 218, 644 N.E.2d at 1187.

Based on our holding, we need only address the admissibility of defendant's statement and the trial court's restrictions on defendant during *voir dire.* Defendant argues that the trial court erred in denying his motion to suppress and finding that his statement was voluntary. He contends that his inability to speak English, deteriorating physical condition due to his diabetes, sleep deprivation, and improper diet all contributed to render his statement involuntary under the totality of the circumstances test. The State responds that defendant spoke English well, was promptly fed and was given medical attention, his condition was not life threatening and defendant never complained of illness.

■ When reviewing whether defendant's statement was voluntary, we accord great deference to the trial court's factual findings and will reverse those findings only if they are against the manifest weight of

the evidence. *In re G.O.*, 191 Ill. 2d 37, 50, 727 N.E.2d 1003, 1010 (2000). However, we apply the *de novo* standard of review when analyzing the ultimate question of whether defendant's confession was voluntary. *In re G.O.*, 191 Ill. 2d at 50, 727 N.E.2d at 1010.

In this case, the resolution of defendant's motion to suppress lasted over 1¹/₂ years and included the extensive testimony of many witnesses. After numerous continuances, neither side orally argued in support of or against the motion. When the trial court eventually ruled, it merely held that the statement was voluntary and denied the motion without making any findings of fact. In *In re G.O.*, our supreme court cautioned that for the above-stated standard of review to function properly:

> "[T]rial courts must exercise their responsibility to make factual findings when ruling on motions to suppress. Reviewing courts should not be required to surmise what factual findings that the trial court made. Instead, the trial court should make clear any factual findings upon which it is relying. It is only through this synergy between the trial and reviewing courts that appellate courts can develop a uniform body of precedent to guide law enforcement officers in their determination of whether their actions may violate the constitution." *In re G.O.*, 191 Ill. 2d at 50, 727 N.E.2d at 1010.

Here, we are hampered in our review of the voluntariness of defendant's statement because the trial court failed to make any factual findings or credibility determinations. Therefore, we must assume that the trial court accepted Dr. Arturo's opinion and those of the other State witnesses when he found defendant's statement voluntary. We will thus review *de novo* the ultimate question of voluntariness based on the facts presented by the State.

In determining whether a confession is voluntary, we consider the totality of the circumstances. *In re G.O.*, 191 Ill. 2d at 54, 727 N.E.2d at 1012. Factors of this analysis include defendant's age, intelligence, background, experience, mental capacity, education and physical condition at the time of questioning; the legality and duration of the detention; the duration of the questioning; and any physical or mental abuse by the police, including any threats or promises. *In re G.O.*, 191 Ill. 2d at 54, 727 N.E.2d at 1012. No single factor is dispositive. *In re G.O.*, 191 Ill. 2d at 54, 727 N.E.2d at 1012. The test of voluntariness is "whether the defendant made the statement freely, voluntarily, and without compulsion or inducement of any sort, or whether the defendant's will was overcome at the time he or she confessed." *People v. Gilliam*, 172 Ill. 2d 484, 500, 670 N.E.2d 606, 613 (1996).

Defendant first contends that his inability to speak English

contributed to the involuntariness of his statement. Several police officers and Assistant State's Attorney Lyman testified that defendant communicated in English for the majority of the interviews. Further, a Spanish interpreter was always present to translate if needed and did so approximately 25% of the time. Defendant was "Mirandized" in both English and Spanish and stated that he understood those rights. Lyman read aloud, in English, defendant's statement and Bribiesca then translated the entire statement into Spanish. Thus, defendant spoke and understood English and also had the benefit of an interpreter during his interviews. We therefore reject defendant's argument. See *People v. Villagomez*, 313 Ill. App. 3d 799, 808-09, 730 N.E.2d 1173, 1181 (2000).

Defendant next contends that his deteriorating physical condition, sleep deprivation and improper diet rendered his statement involuntary. When defendant stated that he would soon need insulin, the officers brought him to St. Anthony's Hospital, where he was treated and released within an hour. The officers also testified that defendant stated that he felt fine, he never complained about his physical condition or asked for medical attention except for his one request for insulin, which was granted. Moreover, defendant never appeared tired or sick throughout the interviews. The police officers and Lyman testified that defendant was given hamburgers, french fries, fruit, soda, coffee and water and never requested any other food. The State's expert stated that in his opinion, with the insulin defendant received and food consumed after midnight on March 21, defendant would be fine during the interviews throughout the night. While Dr. Arturo diagnosed defendant as having the less severe condition of ketosis at Cook County Hospital, there is no evidence that defendant had this condition before 11 a.m. on March 22, nearly five hours after he signed his confession. Further, Dr. Arturo testified that defendant never suffered from the more serious condition of ketoacidosis.

Based on this evidence, we find that defendant was not suffering from any adverse medical condition during his questioning that would have overcome his free will when making his statement. Defendant's claim that his improper diet contributed to his deteriorating medical condition is thus without merit. Further, while lack of sleep is one factor to consider in evaluating the voluntariness of defendant's confession, we find this factor is not dispositive here. *People v. Cardenas*, 209 Ill. App. 3d 217, 226, 568 N.E.2d 102, 109 (1991). The police officers and assistant State's Attorney testified that defendant never appeared tired or stated that he needed sleep. While he was questioned during the night, he was not questioned continuously and was allowed breaks to eat and receive insulin. We reject defendant's argument that the

combination of these factors together rendered defendant's statement involuntary. Therefore, based on the totality of the circumstances, we find defendant's statement was voluntary and the trial court properly denied defendant's motion to suppress. Further, after reviewing the record, we find no error, individually or cumulatively, from the trial court's restriction on defendant's cross-examination during the hearing on defendant's motion.

Defendant next argues that the trial court improperly refused defendant the opportunity to ask questions of the venire concerning their potential bias against drug dealers under *People v. Strain*, 194 Ill. 2d 467, 742 N.E.2d 315 (2000). In *Strain*, gang evidence permeated the testimony at defendant's trial for first degree murder. The trial court refused to allow defendant to ask the venire whether the jurors would find defendant less believable if they knew he was in a gang. *Strain*, 194 Ill. 2d at 471, 742 N.E.2d at 317. Our supreme court recognized that there may be strong prejudice in our society against street gangs and reiterated that jurors must not harbor any bias or prejudice which would prevent them from rendering a verdict according to the law and evidence. *Strain*, 194 Ill. 2d at 477, 742 N.E.2d at 320-21. The court then held that when testimony regarding gang membership and gang-related activity is to be an integral part of defendant's trial, the defendant must be afforded an opportunity to question prospective jurors concerning gang bias. *Strain*, 194 Ill. 2d at 477, 742 N.E.2d at 321.

In this case, defendant attempted to ask venire members "Do you believe that a person who is a drug dealer is more likely to commit other crimes such as murder than a person who is not a drug dealer[?]" Later in the *voir dire*, the trial court also refused to allow defendant to ask "Has any member of your family or close friends [sic] ever been accused of any crime where they used the sell [sic] or possession of drugs[?]" and "Has anyone on the panel ever been involved in a Just Say No campaign?" After defendant asked the first question, the State objected and the trial court found the question improper and refused to allow defendant to ask it. Defendant explained that he was trying to discover any bias or prejudice in the venire against drug dealers. The court and the parties then reworded the question and the trial court permitted defendant to ask "If instructed by Judge Reyna, would you be able to put aside your feelings about crimes not charged here such as drug dealing and base your verdict solely on the evidence concerning the crimes charged?" The trial court had previously asked whether the jurors had ever been an accused, a complainant, or a witness in a criminal case.

We find that *Strain* is limited only to cases involving gang member-

ship and gang-related evidence and we will not extend it to this case. However, even if *Strain* did apply here, we find that the question permitted by the trial court was sufficient to probe the venire for potential bias and prejudice against drug dealers. With that question, jurors were asked whether they had any feelings about drug dealing and whether those feelings would impact their ability to fairly decide this case based on the evidence and law. Defendant's question, and the one asked by the trial judge about jurors' involvement in prior criminal cases, worked to expose juror predisposition toward, and bias against, drug dealing and therefore complied with *Strain*.

Because we remand this case, we need not discuss the remainder of defendant's claims. For the foregoing reasons, we reverse and remand for a new trial.

Reversed and remanded.

HOFFMAN, P.J., and HARTMAN, J., concur.