# Illinois Official Reports

## Appellate Court

---

### *People v. Campos*, 2019 IL App (1st) 152613

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. MIGUEL CAMPOS, Defendant-Appellant. |
| District & No. | First District, Second Division<br>Docket No. 1-15-2613 |
| Filed | January 29, 2019 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 13-CR-19562; the Hon. William G. Lacy, Judge, presiding. |
| Judgment | Affirmed in part and vacated in part. |
| Counsel on Appeal | Michael J. Pelletier, Patricia Mysza, and Talon K. Nouri, of State Appellate Defender's Office, of Chicago, for appellant.<br><br>Kimberly M. Foxx, State's Attorney, of Chicago (Alan J. Spellberg, John E. Nowak, and Hareena Meghani-Wakely, Assistant State's Attorneys, of counsel), for the People. |
| Panel | JUSTICE PUCINSKI delivered the judgment of the court, with opinion.<br>Justice Hyman concurred in the judgment and opinion.<br>Presiding Justice Mason specially concurred, with opinion. |

**OPINION**

¶ 1          Following a bench trial, defendant Miguel Campos was convicted of eight counts of aggravated criminal sexual abuse (720 ILCS 5/12-16(b) (West 2006) (renumbered as section 11-1.6 by Public Act 96-1551, § 5 (eff. July 1, 2011))), and sentenced to concurrent terms of seven years' imprisonment. On appeal, defendant contends that four of his convictions should be vacated because they are based on the same physical act as his other convictions and, therefore, violate the one-act, one-crime rule. Defendant also contends that his trial counsel was ineffective for failing to file a motion to suppress his inculpatory statement.

¶ 2                                        I. BACKGROUND

¶ 3          Defendant was charged by indictment with 25 counts of aggravated criminal sexual abuse. Prior to trial, the State moved to nol-pros all but 10 counts. The 10 remaining counts alleged that defendant committed aggravated criminal sexual abuse in that he touched, for sexual gratification: J.C.'s penis with his hand between the dates of August, 26, 2010, and August 26, 2013 (count V), and August 9, 2007, and August 25, 2010 (count XVIII); L.S.'s penis with his hand between the dates of August 26, 2010, and August 26, 2013 (count VI), and November 24, 2009, and August 26, 2013 (count XIV); M.S.'s breasts with his hand between the dates of August 26, 2010, and August 26, 2013 (count VII), and February 3, 2007, and August 25, 2010 (count XX); M.S.'s vagina with his hand between the dates of August 26, 2010, and August 26, 2013 (count VIII), and February 3, 2007, and August 25, 2010 (count XXI); M.S.'s breasts with his mouth between the dates of August 26, 2010, and August 26, 2013 (count IX), and February 3, 2007, and August 25, 2010 (count XXII). Defendant waived his right to a jury trial and the case proceeded to a bench trial. Because defendant does not challenge the sufficiency of the evidence to sustain his convictions, we recount the facts only to the extent necessary to resolve the issues raised on appeal.

¶ 4          At trial, Ambie Tolly testified that she was a therapist who worked with defendant's four children: L.S., his 19-year-old stepson; M.S., his 18-year-old stepdaughter; J.C., his 12-year-old son; and K.C., his 8-year-old daughter. According to Tolly, M.S. is socially and emotionally delayed. Tolly stated that M.S. also has a learning disability related to reading. She explained that L.S. cannot communicate verbally due to a traumatic brain injury he suffered as a child. Tolly described that J.C. is cognitively delayed, and although he can speak, he responds to questions with nonresponsive or inappropriate answers. Tolly testified that she asked J.C. about the allegations against defendant and if "anything had happened to him." He told her "no."

¶ 5          Detective Muniz testified that, on September 2, 2013, she was assigned to investigate M.S.'s allegations of abuse against defendant. A few days later, Muniz interviewed M.S. at Chicago Children's Advocacy Center. M.S. was 16 years old at the time. From that interview, Muniz learned about potential abuse against M.S.'s siblings, which prompted Muniz to open additional investigations. Interviews with L.S. and J.C. were unsuccessful because they lacked the verbal capacity to participate in a forensic interview. Muniz also interviewed M.S.'s mother, L.R., and a family friend, J.L.G.

¶ 6          On September 11, 2013, defendant was arrested. Muniz, accompanied by another detective, interviewed defendant at the Fourth District police station. Muniz ascertained that

defendant spoke only Spanish. Muniz stated that she grew up in a Spanish-speaking home. She speaks Spanish fluently and can read and write in Spanish. Muniz read defendant his *Miranda* rights in Spanish from a preprinted form, pausing after she read each right to obtain defendant's verbal assent that he understood. Defendant signed a form acknowledging that he understood his rights. Defendant then agreed to speak with Muniz.

¶ 7 Muniz stated that defendant initially denied that he touched M.S. inappropriately. When she informed defendant that M.S. claimed to have seen him touching his other children, he began to cry, screamed, clutched his chest, and reiterated that he did not inappropriately touch his children. Muniz showed defendant a photograph of M.S., at which time defendant told Muniz that M.S. was not a liar and that, if she said that he touched her, then he had. Muniz testified that defendant told her that he "wanted to feel liberated." He told Muniz that he had touched M.S.'s vagina and breast, J.C.'s penis, L.S.'s penis, and K.C. "all over her body." Defendant told Muniz that "he could do whatever he want[ed] to them because they're his children, and that's how he showed them his love." Muniz then called for an assistant state's attorney to join the interview. Defendant was not handcuffed during his interview with Muniz. During the interview, defendant was provided with water and food.

¶ 8 When Assistant State's Attorney Karr arrived, Muniz relocated defendant to an office to be interviewed. Defendant was not handcuffed during this interview. Karr read defendant his *Miranda* rights in English and Muniz translated them into Spanish for defendant. After each right, defendant acknowledged that he understood and agreed to speak with Karr. When defendant did so, Muniz and the other officer were sent out of the room, and another Spanish-speaking officer replaced them, so that Karr could ask defendant how he had been treated. After a short time, Muniz returned to the room, and the other Spanish-speaking officer left. Defendant agreed to memorialize his statement in writing.

¶ 9 To elicit defendant's statement, Muniz translated defendant's words for Karr, who then typed them in English. At the conclusion, Karr printed out the statement and read it to defendant, line by line, in English. Muniz then translated each line into Spanish for defendant. Karr asked defendant to sign at the bottom of each page to indicate that everything was as he wished. Defendant was told that he was free to make changes if he so desired. Defendant insisted on multiple changes, which were then initialed by all three participants. After reading through the entire statement, Karr photographed defendant and then had him sign the photograph. Muniz read defendant's entire handwritten statement in open court.

¶ 10 In the statement, defendant related that he was 72 years old. He was born in Algeria, El Salvador, where he attended school through the sixth grade. He moved to the United States in 1990. He acknowledged that Muniz acted as his translator, and that he had no problems understanding her. Defendant stated that he had a special relationship with M.S. and that he "caresse[d] and kisse[d]" her all over her body to show her how much he loved her. Defendant kissed M.S.'s face, fingernails, and breasts. He also touched M.S. "all over her body" with his hands, including her breasts and vagina. Defendant did not remember the first time that he touched M.S.'s vagina, but he stated that she was "much younger than she is now." He did not have bad intentions when he touched M.S. He acknowledged that M.S. was not a liar, and he would not deny anything that she said. He disputed that J.L.G. ever saw him touching M.S. Defendant stated that he touched his wife in the same way that he touched M.S because that is the way that he showed his love. When M.S. asked defendant for money, he would respond by

asking what she would give him in return. She replied, "La panocha," which defendant understood to be a Spanish slang term for "vagina."

¶ 11    In the statement, defendant also acknowledged that he touched L.S.'s penis. He would grab L.S.'s penis and tell him how big it was, which would make L.S. smile. Defendant showed the same type of affection to K.C., but they were not as close as he was with M.S. He stated that he "touch[ed] and kiss[ed]" K.C. all over her body, but she told him that "she belong[ed] to her mother only." Defendant stated that he touched J.C.'s penis, "skin to skin," while J.C. took a bath. Defendant stated that he feels as though "he can do whatever he wants as far as kissing and touching and caressing his children because they are his children and he loves them."

¶ 12    In the statement, defendant acknowledged that Karr asked Muniz and the other officer to leave the room, and Chicago police officer DeAnda, who speaks Spanish, joined the interview as defendant's translator. Defendant stated that he had no difficulties understanding DeAnda. Defendant told DeAnda and Karr that he was treated well. He had been offered two donuts, which he ate, and was allowed to use the bathroom. Defendant stated that nobody threatened him or promised him anything in order to elicit his statement and he was not under the influence of drugs or alcohol. He stated that he was giving his statement "freely and voluntarily."

¶ 13    On cross-examination, Muniz testified that she was aware that defendant had visited the hospital on the day before his interview. She was not aware that he was on medication. Muniz acknowledged that, during her interview with defendant, he told her that he touches his children in the way that a father does and not in the way that a man touches his wife.

¶ 14    On redirect examination, Muniz testified that defendant told her during their interview that his penis does not "get hard" like it did when he was younger, but it still "gets hard" every 15 to 21 days.

¶ 15    On recross-examination, Muniz testified that defendant's statement that he does not "get hard" anymore came immediately after he stated that he did not remember how old M.S. was when he began touching her. Muniz also acknowledged that defendant told her that he still has sexual intercourse with his wife.

¶ 16    M.S. testified that she was born on February 3, 1997. For most of her life, defendant was the only father she had known. When she was 10 years old, defendant touched her vagina while she stood in her underwear. M.S. stated that defendant's hand reached inside of her underwear when he touched her vagina. Later, when M.S. was 14 years old, she was sitting on their living room sofa with defendant. Her brother, L.S., was also in the room. While on the sofa, defendant touched M.S.'s vagina inside of her underwear with his hand. He also put his mouth on the skin of her breasts. As this happened, J.L.G. entered the living room through the porch door. Defendant stopped touching M.S., and J.L.G. left the room. M.S. did not tell anybody about defendant's actions because she was scared of him. M.S. stated that, when she was 14 years old, defendant began sleeping in her bed with her. Eventually, M.S. slept in the living room because she did not want defendant sleeping in a bed with her.

¶ 17    Approximately two years later, on August 26, 2013, when M.S. was 16 years old, she was in the kitchen with defendant and L.S. Defendant remarked to her that he had not touched her "for a while." M.S. agreed that he had not. After her reply, defendant approached M.S. and touched her vagina, with his hand, inside of her underwear. As he did so, M.S. used her phone to take a photograph of defendant. The porch door swung open due to a gust of wind and defendant stopped touching M.S. A few days later, M.S. told her mother that defendant had

- 4 -

touched her vagina and that if her mother did not do anything, she would run away. M.S. and her siblings were sent to live with relatives. M.S. stated that she texted the photograph that she took of defendant to Muniz. M.S. identified the photograph in open court and it was then admitted into evidence.[1]

¶ 18    M.S. stated that defendant touched her breasts "more than one time." She could not recall how old she was when the different instances occurred. Defendant would touch her breasts with his hands inside of her shirt. She stated that there were times when defendant touched her breasts when she was old enough to wear a bra. During those times, defendant would touch her breasts inside of her bra. When defendant touched M.S.'s breasts, he would move his hand "back and forth."

¶ 19    When M.S. was 15 years old, she saw defendant touch L.S.'s penis while the three of them were in the living room together. Defendant touched L.S.'s penis with his hand and said, "You are my son and I can do this to you." At this time, L.S. was 16 years old. On another occasion, M.S. was in the living room with defendant when K.C., who had just finished showering, entered wearing only a towel. M.S. saw defendant approach K.C. and touch her vagina with his hand. K.C. was five years old.

¶ 20    On cross-examination, M.S. acknowledged that she recalled speaking to Muniz about what had happened to her. She did not recall telling Muniz that the first time defendant touched her, "inside of her shorts," was on August 26, 2013. M.S. acknowledged that she did not recall all of the details of the incidents that transpired when she was 10 years old and 14 years old, such as what she was wearing or what time of the year they occurred. M.S. also acknowledged that defendant never hit or threatened her. M.S. stated that defendant did not touch her when he slept in the same bed as her for a month. M.S. told Muniz that defendant was sleeping in her bed because K.C. was scared and wished to sleep with their mother. M.S. did not recall several of the statements that she made to Muniz. M.S. acknowledged that defendant never tried to have sex with her and that she never touched his penis. She also conceded that she had never seen his penis get hard when he was in her presence.

¶ 21    On redirect-examination, M.S. testified that defendant touched her breasts on more than one occasion between the time when she was 10 years old and 16 years old. M.S., however, could not recall the exact amount of times that he touched her breasts. M.S. also stated that, during that same time frame, defendant touched her vagina more than once. M.S. could not recall exactly how many times defendant touched her vagina.

¶ 22    L.R. testified that she was married to defendant for 11 years. When she met defendant, she already had two children, M.S. and L.S., from a previous relationship. Eventually, she and defendant had two more children of their own: J.C. and K.C. She stated that, at some point in 2011, defendant told her that he wanted to sleep in M.S.'s bed because she was afraid. L.R. told him that he could not share a bed with M.S. because he had married her and not M.S. In response, defendant hit L.R. and said "nasty things" to her. Defendant slept in M.S.'s bed for a month. At some point, M.S. approached L.R. and asked if she could sleep with her because defendant was forcing M.S. to sleep in the same bed as him. L.R. allowed M.S. to sleep in her bed. A year later, in the summer of 2012, L.R. operated a stand located in front of their house where she sold corncobs and fruit. One day, while L.R. was at the stand, her younger daughter,

---

[1]A copy of the photograph was not included in the appellate record.

K.C., told her to go inside. L.R. entered the home and made her way into the living room. There, she saw defendant kneeling in front of M.S., touching her breasts and upper thigh.

¶ 23 L.R. further testified that, at some time in 2007, when J.C. was five years old, she was giving him a bath one morning and she forgot to bring his clothes into the bathroom. She left J.C. in the bathtub and went to retrieve some clothes for him. When she returned, defendant was in the bathroom and touching J.C.'s penis. L.R. asked defendant what he was doing. Defendant told her that J.C. was his son and that he could do this whenever he wanted. L.R. testified that a similar incident occurred with L.S. in 2011. L.R. was bathing L.S. and when she left to fetch his clothes, she returned to find defendant touching L.S.'s penis. L.R. questioned what defendant was doing and he told her to shut up and hit her. L.R. described another incident, in 2009, when her daughter K.C. was three years old. L.R. saw defendant bathing K.C. and touching her breasts and vagina.

¶ 24 According to L.R., on August 29, 2013, she had a conversation with M.S. Two days after that, on August 31, 2013, L.R. argued with defendant, and he left their home. L.R. then called a friend to take her to the police station. L.R. testified that she did not go to the police earlier because defendant had threatened to send her back to Mexico.

¶ 25 On cross-examination, L.R. acknowledged that she never told Muniz that defendant had threatened her or her children. L.R. also acknowledged that she never called the police to report defendant's actions prior to when she met with Muniz. L.R. told Muniz that, prior to August 26, 2013, everything was "good" between her and defendant. L.R. never told Muniz that she had seen defendant inappropriately touching L.S., J.C., or K.C. She stated that she did not recall telling Muniz that she asked defendant to bathe L.S. after she noticed that L.S.'s penis was "reddish," as though he had been masturbating.

¶ 26 L.R. described J.L.G. as a friend of both her and defendant. She acknowledged that J.L.G. drove her to court that day. L.R. denied that she and J.L.G. were in a relationship. L.R. stated that M.S. initially did not tell her that defendant touched her vagina. Rather, M.S. told her that defendant had touched her breasts over her clothes. L.R. acknowledged that her signed statement to Muniz stated that, when she walked in on defendant and M.S. in the living room, defendant was kneeling with his back to her and she could not see what he was doing.

¶ 27 J.L.G. testified that he had known defendant for 20 years and L.R. for 15 years. J.L.G. would do work on their home, including laying floor and painting. On one occasion, in 2012, J.L.G. was working on the home when he walked in on defendant "fondling" M.S. in the living room. J.L.G. saw defendant's hands on M.S.'s upper thigh and his head was on her breasts. M.S. was wearing a shirt and shorts. When J.L.G. asked defendant why he was doing that, defendant replied that M.S. was his daughter and that he could do as he pleased with her. A few days later, J.L.G. spoke with defendant about what he had seen. Defendant told him that he was doing what he wanted because it was his house and that J.L.G. should not interfere. J.L.G. admitted that he paid for M.S.'s cellular phone bill when she would do well in school.

¶ 28 On cross-examination, J.L.G. conceded that he never saw defendant's hands on M.S.'s breasts. He also acknowledged that M.S. was not crying when he saw her. J.L.G. did not call the police to report what he had seen. J.L.G. admitted that he gave M.S. money to spend at school. He denied that he received anything in return. He also denied that he was in a relationship with L.R. J.L.G. stated that his wife knew that he gave M.S. money. He also admitted that defendant sold him a truck on an installment plan, but that he stopped paying defendant because the truck was "no good."

¶ 29      The State entered into evidence certified birth certificates for J.C. and L.S. The certificates showed that J.C. was born on August 9, 2002, and L.S. was born November 24, 1995. The State then rested.

¶ 30      The parties stipulated that, if recalled, Muniz would testify that M.S. told her that the first time defendant touched her was when she was 15 years old. M.S. stated that defendant did not touch her from the ages of 10 to 14. M.S. told Muniz that August 26, 2013, was the first time that defendant's hand was inside of her shorts. M.S. told Muniz that when she was 15, she told her mother that defendant touched her legs, but not her breasts.

¶ 31      The parties further stipulated that Muniz would testify that L.R. told her that M.S. never mentioned that anybody had touched her. L.R. told Muniz that she took L.S.'s clothes off and saw that his penis was "reddish as if he had masturbated." L.R. asked defendant to bathe him because she felt that he was too big for her to bathe. L.R. told Muniz that defendant never bathed L.S. because he was too tired.

¶ 32      In announcing its decision, the court stated that it found M.S.'s testimony "very credible," despite "some impeachment." The court also found her testimony to have been corroborated by the credible testimony of L.R. and J.L.G. The court also noted that M.S.'s testimony was "especially corroborated" by defendant's handwritten statement. Based on this, the court found defendant guilty on counts VI, VII, VIII, IX, XIV, XX, XXI, and XXII. The court found defendant not guilty on counts V and XVIII. The court denied the defendant's motion for a new trial.

¶ 33      Defendant was sentenced to eight concurrent terms of seven years' imprisonment. The court denied his motion to reconsider sentence. Defendant timely appealed.

¶ 34      II. ANALYSIS

¶ 35      Defendant contends that four of his convictions—counts VI, XX, XXI, and XXII—should be vacated because they are duplicative of his other four counts and, thus, violate the one-act, one-crime rule. As a threshold matter, defendant acknowledges that he failed to raise this issue in the trial court and thus failed to preserve the issue for appeal. The parties agree, however, that our supreme court has repeatedly found that a one-act, one-crime violation is reviewable under the second prong of the plain-error doctrine because it affects the integrity of the judicial process. *People v. Nunez*, 236 Ill. 2d 488, 493 (2010); *In re Samantha V.*, 234 Ill. 2d 359, 378-79 (2009). Before considering whether the plain-error exception to the rule of forfeiture applies, we must first determine whether any error occurred. *People v. Herron*, 215 Ill. 2d 167, 187 (2005). Here, we find that the court erred in convicting defendant on counts XX and XXII.

¶ 36      The one-act, one-crime rule prohibits multiple convictions carved from the same physical act. See *People v. Almond*, 2015 IL 113817, ¶ 47; *People v. King*, 66 Ill. 2d 551, 566 (1977). To determine whether simultaneous convictions violate the one-act, one-crime rule, this court performs a two-step analysis. *People v. Miller*, 238 Ill. 2d 161, 165 (2010). First, we must determine if the offenses stem from multiple acts or a single act. *Id.* "Multiple convictions are improper if they are based on precisely the same physical act." *Id.* An "act" is defined as any overt or outward manifestation that will support a different offense. *King*, 66 Ill. 2d at 566. If we determine that the offenses stem from separate acts, we move on to the second step of the analysis and determine whether any of the offenses are lesser-included offenses. *Miller*, 238 Ill. 2d at 165. "If an offense is a lesser-included offense, multiple convictions are improper."

*Id.* Whether a conviction should be vacated under the one-act, one-crime principle is a question of law, which we review *de novo*. *People v. Johnson*, 237 Ill. 2d 81, 97 (2010).

¶ 37      In order for multiple convictions to stand, a charging instrument must indicate that the State intended to treat defendant's conduct as multiple acts. *People v. Crespo*, 203 Ill. 2d 335, 342-45 (2001) (emphasizing that each stab wound made by defendant could have supported multiple convictions, but the indictment showed that the State intended to treat defendant's conduct as a single attack because the State did not apportion the crimes among the stab wounds). The record shows that the State charged defendant with multiple counts of aggravated criminal sexual abuse based on different physical acts that occurred during various time frames. Defendant was found guilty on eight of those counts (counts VI, VII, VIII, IX, XIV, XX, XXI, and XXII). Counts VI and XIV concern defendant's touching of L.S.'s penis. Count VI covers the time frame between August 26, 2010, and August 26, 2013. Count XIV covers the time frame between November 24, 2009, and August 26, 2013. Counts VII, VIII, IX, XX, XXI, and XXII concern defendant's touching of M.S.'s breasts and vagina with his hand and mouth. Counts VII, XIII, and IX cover the time frame between August 26, 2010, and August 26, 2013. Counts XX, XXI, and XXII cover the same conduct as counts VII, VIII, and IX, respectively, but concern the time frame between February 3, 2007, and August 25, 2010.

¶ 38      In this court, defendant argues that count VI should be vacated because it is duplicative of count XIV in that it alleges the same conduct and covers virtually the same time frame. He further argues that counts XX, XXI, and XXII are duplicative of counts VII, VIII, and IX, and should be vacated because the State's evidence did not properly apportion his conduct to the different time periods covered by the charges. We begin our analysis by considering the evidence presented at trial to determine whether defendant's convictions were based on the same physical act and occurred in the same period of time.

¶ 39      With respect to counts VI and XXI, we find that the trial court did not err in entering convictions on both counts of aggravated criminal sexual assault because the State's evidence described separate acts, which occurred during the time frames specified in the charges. Stated differently, counts VI and XXI do not violate the one-act, one-crime rule because the State's evidence showed two separate acts for which defendant was convicted.

¶ 40      Count VI alleged that defendant touched L.S.'s penis between the time frame of August 26, 2010, and August 26, 2013. During this time frame, L.S. was between 14 years old and 18 years old. Count XIV alleged that defendant touched L.S.'s penis between the time frame of November 24, 2009, and August 26, 2013. During this time frame, L.S. was also between 14 years old and 18 years old. At trial, the State's witnesses testified that defendant touched L.S.'s penis on two separate occasions. The first instance, which L.R. testified to, came following a question by the state's attorney drawing her attention to "approximately 2011" when L.S. was 14 years old. L.R. testified that, during this time frame, she saw defendant touch L.S.'s penis in the bathtub. Although L.S. would have been 15 years old in 2011, as his birthday was November 24, 1995, it still falls within the time frame for both counts VI and XIV. The second instance, to which M.S. testified, occurred when L.S. was 16 years old. M.S. stated that she saw defendant grab L.S.'s penis in the living room. Likewise, this conduct falls within the time frame of either count VI or XIV. There is no doubt that these are two separate and distinct acts, which occurred during the time frames specified in the charges. As such, because L.R. and M.S. both testified to different instances in which defendant touched L.S.'s penis, the convictions do not violate the one-act, one-crime rule.

¶ 41        In reaching this conclusion, we are not persuaded by defendant's argument that this case is analogous to *People v. Strawbridge*, 404 Ill. App. 3d 460, 462-63 (2010). In *Strawbridge*, the State charged the defendant with, *inter alia*, two counts of predatory criminal sexual assault alleging the same conduct against the same victim, but covering two disparate time periods: the first count covered June 24, 1999, through March 20, 2000, and the second count covered March 20, 2000. *Id.* at 461-62. The defendant was convicted on both counts and appealed, arguing that his convictions violated the one-act, one-crime rule. *Id.* at 461. On appeal, the court noted that the victim testified to an encounter that occurred on March 20, 2000. *Id.* at 465. "The problem" as the court saw it, was that "[it could not] tell what the jury based its verdict on." *Id.* at 463. The court went on to state that, although it agreed with the State that there was "adequate evidence in the record to support convictions on multiple counts," it would not "place [itself] in the position of the jurors and try to determine how they reached their verdict." *Id.* Here, unlike in *Strawbridge*, defendant was convicted in a bench trial. In *People v. Span*, 2011 IL App (1st) 083037, ¶ 88, we emphasized that, unlike a jury, an "experienced trial judge would [understand] the need to consider whether there was sufficient evidence to conclude that the defendant's actions constituted separate offenses." Here, the trial court heard the testimony of M.S. and L.R., which described two separate acts that occurred at different points in time. Given this distinction, we cannot conclude that the trial court erred when it convicted defendant on counts VI and XIV.

¶ 42        Next, counts VIII and XXI are not duplicative because they are based on different acts that occurred during different periods of time. Count VIII alleged that defendant touched M.S.'s vagina with his hand during the time frame between August 26, 2010, and August 26, 2013. During this time frame, M.S. was between 13 years old and 16 years old. Count XXI alleged that defendant touched M.S.'s vagina with his hand during the time frame between February 3, 2007, and August 25, 2010. During this time frame, M.S. was between 10 years old and 13 years old. M.S. testified that, when she was 10 years old, defendant touched her vagina with his hand while she stood in a doorway in her underwear. This evidence supports defendant's conviction on count XXI. Likewise, M.S. testified to multiple instances of defendant touching her vagina with his hand when she was 14 years old and 16 years old. Any of these instances supports defendant's conviction on count VIII. Because the evidence shows that defendant was convicted based on separate physical acts that occurred during the specified time frames, these two convictions do not violate the one-act, one-crime rule.

¶ 43        However, we find that the trial court erred in convicting defendant of counts XX and XXII because the State's evidence failed to establish that he committed separate acts during the specified time frame. Counts XX and XXII alleged that defendant touched M.S.'s breasts with his hand or mouth, respectively, between February 3, 2007, and August 25, 2010. This time frame covered the period when M.S. was between the ages of 10 years old and 13 years old. The testimony at trial, however, only described instances that occurred when M.S. was 14 years old or older, which is the time period covered by counts VII and IX. Specifically, M.S. testified that defendant touched her breasts with his mouth when she was 14 years old. Likewise, L.R. testified that she saw defendant touch M.S.'s breasts with his hands when M.S. was 15 years old. While defendant admitted, in his statement, that he started touching M.S. when she was "much younger" than 16 years old, there is no specific evidence that he touched her breasts in any way when she was younger than 14 years old as alleged in counts XX and XXII. Accordingly, we conclude that defendant's convictions on counts XX and XXII must be

vacated for violating the one-act, one-crime rule because they are based on the same physical acts charged in counts VII and IX.

¶ 44    In sum, we affirm defendant's convictions on counts VI, VII, VIII, IX, XIV, and XXI, and vacate defendant's convictions and sentences on counts XX and XXII.

¶ 45    On appeal, defendant next argues that his counsel was ineffective for failing to file a motion to suppress his handwritten statement. He contends that his counsel knew that the circumstances culminating in his statement suggested that it had not been given voluntarily. Specifically, defendant points to the following factors as evidence that the statement was not voluntary: his inability to communicate in English, that the lead detective on his case acted as his sole translator, that the statement he signed was prepared in English and read to him in Spanish by the same detective, his advanced age, his limited education, and his recent hospitalization.

¶ 46    We evaluate claims of ineffective assistance of counsel under the two-prong approach set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). See *People v. Givens*, 237 Ill. 2d 311, 330-31 (2010). To prevail on a claim of ineffective assistance, a defendant must first demonstrate that counsel's performance was deficient by showing that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland*, 466 U.S. at 687; see also *People v. Coleman*, 183 Ill. 2d 366, 397 (1998). In so doing, the defendant "must overcome the strong presumption that the challenged action or inaction of counsel was the product of sound trial strategy and not of incompetence." *Coleman*, 183 Ill. 2d at 397. Second, the defendant must show he was prejudiced by counsel's deficient performance, which means that that there must be a "reasonable probability" that, but for defense counsel's deficient performance, the result of the proceeding would have been different. *People v. Griffin*, 178 Ill. 2d 65, 74 (1997). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* Failure to establish either prong precludes a finding of ineffective assistance of counsel. *People v. Henderson*, 2013 IL 114040, ¶ 11. A reviewing court need not examine counsel's performance where it may dispose of defendant's claim based on lack of prejudice. *People v. Haynes*, 192 Ill. 2d 437, 473 (2000).

¶ 47    In order to establish prejudice based on counsel's failure to file a motion to suppress, defendant must show "first, a reasonable probability that the motion would have been granted and, second, that the outcome of the trial would have been different if the motion had been granted." *People v. Little*, 322 Ill. App. 3d 607, 611 (2001). Counsel is not required to make futile motions in order to provide effective assistance. *People v. Wilson*, 164 Ill. 2d 436, 454 (1994). In order to determine whether there was a reasonable probability that defendant's motion would have been granted, we address the merits of defendant's underlying claim—that his inculpatory statement was not given voluntarily.

¶ 48    In determining whether a statement was voluntary, a reviewing court must examine if the statement was made freely and without compulsion or inducement, or whether the defendant's will was overcome at the time he confessed. See *People v. Richardson*, 234 Ill. 2d 233, 253 (2009). "[A] court must consider the totality of the circumstances of the particular case; no single factor is dispositive." *Id.* Among the factors to be considered in determining whether an inculpatory statement is voluntary are the defendant's mental ability, familiarity with the English language, age, education, and experience with the criminal justice system. See *People v. Bernasco*, 138 Ill. 2d 349, 365 (1990); see also *People v. MacFarland*, 228 Ill. App. 3d 107, 117 (1992).

¶ 49 Here, defendant cannot show that the unargued suppression motion had a reasonable probability of success where the circumstances surrounding his statement indicate that it was voluntarily given. Muniz, who acted as defendant's translator, testified to the entire process of obtaining his handwritten statement. The statement was elicited after an interview with Muniz, who can speak, read, and write Spanish fluently. She stated that she had no problem communicating with defendant, and nothing in the record suggests that defendant had difficulty understanding her. Before both interviews, defendant was read his *Miranda* rights in Spanish, and he acknowledged that he understood those rights. At one point, Muniz left the room and the assistant state's attorney, with the aid of another Spanish-speaking detective, was able to question defendant to ensure that he had been treated properly. Defendant was provided with food and water during the interview.

¶ 50 When it came time to memorialize defendant's statement, he spoke in his native Spanish, Muniz translated it into English, and the assistant state's attorney then typed it out in English. Once it was completed, Muniz read the entire statement, "line by line," to defendant in Spanish. Defendant was told that he could make changes to ensure that the statement was accurate. Defendant made multiple changes, which were then initialed by all three participants. At the conclusion of each page of the statement, defendant signed the bottom. In the statement, defendant acknowledged that nobody threatened him or promised him anything in order to elicit his statement and he was not under the influence of drugs or alcohol. He stated that he was giving his statement "freely and voluntarily." Given this record, we conclude that defendant's statement was voluntary. As such, defendant cannot show a reasonable probability that a motion to suppress his inculpatory statement would have been granted such that he was prejudiced by counsel's failure to file the motion. Accordingly, where defendant has failed to satisfy the prejudice prong of the *Strickland* analysis, his claim of ineffective assistance of counsel must fail.

¶ 51 As defendant acknowledges, this court has upheld the admission of statements given under almost identical circumstances in *People v. Villagomez*, 313 Ill. App. 3d 799 (2000), and *People v. Joya*, 319 Ill. App. 3d 370 (2001). Defendant nevertheless argues that his particular circumstances were factually distinguishable enough to warrant a different outcome. Specifically, he argues that the following circumstances are unique to him: that Muniz, his sole interpreter, was the "lead detective" investigating his case and had interviewed the victims prior to speaking with defendant; that another Spanish-speaking detective was available, but not utilized to take defendant's statement; and his advanced age, his limited education, and his recent hospital visit.

¶ 52 Contrary to defendant's argument, the circumstances in this case are not meaningfully distinguishable from *Villagomez* and *Joya*. Here, as in *Villagomez*, the detective who translated the defendant's statement was also the one investigating his case. *Villagomez*, 313 Ill. App. 3d at 801-02. In fact, in *Villagomez*, the detective had already interviewed two witnesses and challenged the defendant during the interview when his story contradicted that of the two witnesses. *Id.* Similarly, in *Joya*, the detective who acted as the defendant's translator had also spoken with several witnesses prior to interpreting for the defendant. *Joya*, 319 Ill. App. 3d at 374-75. Nothing about Muniz's dual role as the detective investigating defendant's case and his sole interpreter is distinguishable from the facts in *Villagomez* and *Joya*. In this case defendant's statement was taken by the lead investigator in Spanish. It was then translated

from Spanish to English to the state's attorney, who then wrote, in English, the confession, which was then typed and translated back to the defendant from English to Spanish.

¶ 53    Muniz testified that defendant "told her that he touches his children in the way that a father does and not in the way that a man touches his wife," and those words conflict with defendant's statement as read into the record by Muniz at trial that he touches his children the way he touches his wife. This discrepancy was not explained in the trial.

¶ 54    We are likewise not persuaded by defendant's reliance on *In re J.J.C.*, 294 Ill. App. 3d 227 (1998), and *In re Lashun H.*, 284 Ill. App. 3d 545 (1996), for the proposition that defendant's circumstances required "extraordinary care" akin to the special protections afforded to juveniles. Defendant has not provided any support for this proposition, nor did our research produce any. Instead, the record shows that almost all of the factors indicate that defendant's statement was voluntary. First, defendant has lived in the United States since 1990. Although he only achieved a sixth grade education in El Salvador, he has held several jobs, including being a construction worker, an auto mechanic, a machine operator, and a laborer for an auto parts store. He also has experience with the criminal justice system, having been convicted of driving under the influence in 1998.

¶ 55    As mentioned above, because the translation procedures used in eliciting his inculpatory statement conformed to existing precedent for voluntariness and reliability, we are obligated to find those procedures were acceptable.

¶ 56    That being said, we cannot find that the attorney in this case was ineffective for failing to file a motion to suppress the defendant's statements. Although the judge relied on Muniz's testimonial reading of defendant's statement, even if the statement had been excluded from the trial, the direct evidence from victims would be sufficient to convict.

¶ 57    That does not mean, though, that our procedures for interrogating non-English-speaking suspects cannot or should not be revisited in light of our current emphasis on procedural justice and access to justice, both ongoing and important goals of the supreme court.

¶ 58    Facilitating the confidence of non-English-speaking suspects in the legal system is not an unreasonable goal. Their inability to speak and read English impacts the interrogation process. The leading case for voluntariness, *Richardson* (2009), and the leading cases for the reliability of interview/translation process, *Villagomez* (2000) and *Joya* (2001), were decided before procedural justice became a working concept in policing and criminal law generally.

¶ 59    At the very least, we should recognize the possibility that the officers, while competent to speak or read a language, are not trained in the idiomatic nuances and variations among different dialects of a language, let alone trained to use non-English legal terms correctly, as would, for example, trained court interpreters. The reason courts insist on trained interpreters is this very problem: idiomatic language can result in words that have a legal implication where none is intended.

¶ 60    This is a particular problem in cosmopolitan communities where various idiomatic languages may create translation difficulties. Chicago is a good example. According to a report by the City of Chicago in 2015, there were more than 100 languages spoken in the City of Chicago and 560,000 foreign born residents. See City of Chicago Mayor's Office, Office of New Americans, Accomplishments to Date–October 2015, https://www.cityofchicago.org/content/dam/city/depts/mayor/Office%20of%20New%20Americans/ONAInitiativesAccomplished

todate.pdf [https://perma.cc/HMB4-FTUY]. The report identified the top five languages spoken in Chicago as Spanish, Polish, Mandarin, Hindi, and Arabic. *Id.*

¶ 61     The City of Chicago City Council passed its first Language Access Ordinance (Ordinance) in 2015, which requires that immigrants and limited English proficient residents have meaningful access to city services. The intent of the Ordinance acknowledges that more than 400,000 residents of Chicago do not speak English as their primary language and that each city department must develop a plan to ensure meaningful access to services. The Ordinance requires planning and action, including identification and translation of essential public documents, interpretation services, including telephonic interpretation services, and training for frontline workers and managers on language access policies and procedure. Clearly, interactions with the police department qualify as city services. See Municipal Code of Chicago § 2-40-020 (added May 6, 2015).

¶ 62     The Hispanic community of the metropolitan area of Chicago includes people from Mexico, Cuba, Puerto Rico, El Salvador, other Caribbean islands, and South America. Idiomatic language differences exist and make a difference. At a 2016 conference, Brigham Young University Professor Orlando Alba described the linguistic differences of three of the Caribbean Hispanic Islands: the Dominican Republic, Cuba, and Puerto Rico. He "argued that although there are similarities in the linguistics of these three countries, each one has their own identity and particular way of speaking *** they do not share the same way of speaking—that is, the same dialect." Hannah Sandorf, *Spanish Dialects in the Caribbean*, BYU Human. News (Nov. 17, 2016), https://humanities.byu.edu/spanish-dialects-in-the-caribbean [https://perma.cc/6V8B-BAFR].

¶ 63     Spanish on the European Continent includes multiple dialects: Northern Peninsular, Central-Southern Peninsular, Southern Peninsular, and Canarian. See https://en.wikipedia.org/wiki/Spanish_dialects_and_varieties (last visited Dec. 5, 2018) [https://perma.cc/7XFX-LW9G].

¶ 64     In Mexico, there are five major dialects: Northern, Baja Californian, Central, Coastal, and Southern. See Amit Schandillia, *5 Mexican Dialects and How to Tell Them Apart*, PeppyBurro (May 23, 2017), http://www.peppyburro.com/blog/mexican-spanish-dialects [https://perma.cc/SAM4-3U5B]. Altogether there are 287 living languages in Mexico, of which 76 are vigorous. See Gary F. Simons & Charles D. Fenning (Mexico), Ethnologue: Languages of the World, http://www.ethnologue.com/country/MX (last visited Dec. 5, 2018) [https://perma.cc/U8S8-RHJG].

¶ 65     In Poland, there are four major dialects and three recognized minor dialects. See https://www.revolvy.com/page/Dialects-of-Polish (last visited Dec. 5, 2018) [https://perma.cc/T9XN-3M5M].

¶ 66     The Asian community in Chicago includes people from China, Japan, Korea, Vietnam, Thailand, and other Asian countries. Just the many dialects from China alone are numerous and idiomatic.

¶ 67     Spoken Chinese is separated into five main dialectical groups, of which Mandarin is only one. Yue (which includes Cantonese), Min, Wu, and Hakka make up the other 4, covering more than 200 individual dialects. See Accredited Language Services Blog, *What Are the Different Types of Spoken Chinese?* (Nov. 1, 2010), https://www.alsintl.com/blog/spoken-chinese [https://perma.cc/8LDD-UYS9].

¶ 68    In India there are more than 400 languages and an estimated 2000 dialects. While Hindi and English are recognized as the official languages in the Indian Constitution, there are 22 official languages recognized in different states, plus dialects of each. See Scott Johnson, *India, The Country With More Than 2,000 Dialects*, Trusted Translations Blog (Oct. 18, 2011, 9:24 a.m.), http://translation-blog.trustedtranslations/india-the-county-with-more-than-2000-dialects-2011-10-18.html [https://perma.cc/9WAP-5TVH].

¶ 69    These significant dialect differences must be recognized as a concern where police, although well meaning, are untrained translators working at the heart of the criminal justice system.

¶ 70    Procedural justice may best be served when non-English-speaking suspects have an independent, neutral means to verify their statements to police with electronic or digital recordings which can then be subject to independent translations. If the layers of translating back and forth at the police station are not recorded a defendant has no available means to cross examine the testimony of the detective or challenge the content of his statement to police or the detective's testimony. There is no meaningful way to cross examine the officer's testimony because there is no independent record of what was said.

¶ 71    Suspects who speak English are themselves in a position to determine if what is being said to them is accurate. (Where an English speaking suspect cannot read English that creates another as-yet unexplored opportunity for changes in the way that signed statements are verified as reliable.)

¶ 72    We should recognize the possibility that the idiomatic translations of the suspect to the police, the police to the state's attorney, the state's attorney to the police, and the police to the suspect can lose something in translation. Where the confidence of the community is at stake, this is an important issue to review.

¶ 73    Recording equipment has been required in police interrogations for first degree murder cases since 2013. In 2014, the law was expanded, then clarified in its present form (Pub. Act 98-547 (eff. Jan. 1, 2014) (adding 720 ILCS 5/103-2.1(b-5))). As of June 1, 2016, statements made by a suspect in custody and being interrogated by the police will be presumed inadmissible unless there is an electronic recording of the statement made during custodial interrogation and the recording is substantially accurate and not intentionally altered. See 725 ILCS 5/103-2.1(b) (West 2016). This requirement extends to suspects being interrogated for first degree murder, intentional homicide of an unborn child, second degree murder, voluntary manslaughter of an unborn child, involuntary manslaughter and reckless homicide, involuntary manslaughter and reckless homicide of an unborn child, drug induced homicide, predatory criminal sexual assault of a child, aggravated arson, aggravated kidnapping, aggravated vehicular hijacking, home invasion, aggravated criminal sexual assault, armed robbery, and aggravated battery.

¶ 74    It is not unreasonable for a defendant who does not speak English and cannot read English to wonder what everyone around is saying during police encounters. Independent verifiable recorded statements made during the custodial interrogation of non-English-speaking suspects made available to the defense for a double check with the defendant or an independent translation where appropriate is an area of procedural justice that needs attention.

Furthermore, it is clear from the legislation that police departments already have the recording equipment. Extending its use for non-English-speaking suspects by policy or law is

not an unreasonable goal for the community, police departments, and the legislature.

¶ 75                                    III. CONCLUSION

¶ 76        We affirm defendant's conviction on counts VI, VII, VIII, IX, XIV, and XXI. We vacate defendant's conviction and sentences on counts XX and XXII.

¶ 77        Affirmed in part and vacated in part.

¶ 78        PRESIDING JUSTICE MASON, specially concurring:

¶ 79        I concur in the result in this case. I write specially because I do not concur in the majority's extended *dicta* in ¶¶ 57-74.

¶ 80        After he entered this country pursuant to a grant of asylum nearly 30 years ago, Miguel Campos sexually abused all four of his children. He readily confessed, in Spanish, to sexually abusing his daughter to a 25-year veteran of the Chicago Police Department whose native language is Spanish and whom he specifically indicated he had no trouble understanding. According to well-settled law, the police acted appropriately and properly in this case and, given the overwhelming evidence presented at Campos's trial, Campos's counsel was not ineffective for failing to move to suppress his statements. That is the only issue we are called upon to decide in this case regarding counsel's performance and that should be the end of our analysis.